46

Receipt Number
539779

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAY HARRISON MORNINGSTAR,

Plaintiff,

Case: 2:06-cv-11073
Assigned To: Edmunds, Nancy G
Referral Judge: Whalen, R. Steven
Filed: 03-14-2006 At 11:13 AM
CMP MORNINGSTAR V. CITY OF DETROIT, ET AL (TAM)

vs.

CITY OF DETROIT, a municipal corporation; DETROIT POLICE DEPARTMENT; WAYNE COUNTY PROSECUTOR KYM L. WORTHY, individually and in her capacity as an employee of and as the Wayne County Prosecutor; DETROIT POLICE DEPARTMENT, DEPUTY CHIEF DEBORAH ROBINSON, individually and her capacity as an employee of and as Deputy Chief and Director of Training of the Detroit Police Department; DETROIT POLICE DEPARTMENT OFFICERS JAMES TOLBERT, GLENN DAVIS, KENNETH GARDNER, TAWNYA KING, CHARLES ZWICKER, TYRINE WHEATLEY, and LISA BRYSON, individually and in their capacities as employees of and officers of the Detroit Police Department; and JEANETTE WILLIAMS-WHITE, Jointly and Severally,

Defendants.
_______________________________________________/

**COMPLAINT AND JURY DEMAND**

NOW COMES Plaintiff, JAY HARRISON MORNINGSTAR, by his attorneys, Richard G. Convertino and Lenore M. Ferber, and for his Complaint against the above-named Defendants, states as follows:

## JURISDICTION

1) This is a civil rights action brought pursuant to 42 U.S.C. §1983 et. seq.; the Judicial Code, 28 U.S.C. §§ 1331 and 1343(a); and the Constitution of the United States, and supplemental jurisdiction, as codified in 28 U.S.C. §1367(a).

2) This Court has jurisdiction of the action pursuant to 28 U.S.C. §1331. Venue is proper under 28 U.S.C. §1391(b). The parties reside, or, at the time the events took place, resided in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

3) The amount in controversy is greater than $75,000.00, exclusive of attorney fees, costs and interest.

## PARTIES

4) Plaintiff, JAY HARRISON MORNINGSTAR (hereinafter Jay Morningstar or Trooper Morningstar), was at all times relevant to this Complaint, a member of the Michigan Department of State Police, and was assigned to Michigan Department of State Police Detroit Freeway Post #29, 3050 West Grand Boulevard, Detroit, Michigan.

5) Defendant, CITY OF DETROIT, is a municipal corporation, organized and existing under the laws of the State of Michigan and, pursuant to its lawful authority, operates the DETROIT POLICE DEPARTMENT, in the City of Detroit, County of Wayne, State of Michigan, and as such is responsible for the policies, practices, and customs of the Detroit Police Department, and was the employer of Defendant police officers.

6) Defendant, KYM L. WORTHY, was at all times relevant to this Complaint, an employee of the County of Wayne as a prosecuting attorney and oversaw and supervised the prosecution of People v. Morningstar, Case Number 05-06400.

7) Defendant, DEBORAH ROBINSON, Deputy Chief of Police, Director of Training, was at all times pertinent hereto, a duly appointed and civilian member of the Detroit Police Department, responsible for, among other things, officer training.

8) Defendant, TYRINE WHEATLEY, was at all times pertinent hereto, a duly appointed and acting police officer in the City of Detroit, Detroit Police Department, First Precinct, and as such was its agent, servant and/or employee, acting under color of law.

9) Defendant, LISA BRYSON (*nee* Mix, hereinafter "Lisa Mix"), was at all times pertinent hereto, a duly appointed and acting police officer in the City of Detroit, Detroit Police Department, First Precinct, and as such was its agent, servant and/or employee, acting under color of law.

10) Defendant, CHARLES ZWICKER, was at all times pertinent hereto, a duly appointed and acting police officer in the City of Detroit, Detroit Police Department, and as such was its agent, servant and/or employee, acting under color of law.

11) Defendant, TAWNYA KING, was at all times pertinent hereto, a duly appointed and acting police officer in the City of Detroit, Detroit Police Department, Homicide Unit, and as such was its agent, servant and/or employee, acting under color of law.

12) Defendant, KENNETH GARDNER, was at all times pertinent hereto, a duly appointed and acting police officer in the City of Detroit, Detroit Police Department, Homicide Unit, and as such was its agent, servant and/or employee, acting under color of law.

13) Defendant, GLENN DAVIS, was at all times pertinent hereto, a duly appointed and acting police officer in the City of Detroit, Detroit Police Department, Homicide Unit, and as such was its agent, servant and/or employee, acting under color of law.

14) Defendant, JAMES TOLBERT, was at all times pertinent hereto, a duly appointed and acting police officer in the City of Detroit, Detroit Police Department, Homicide Unit, and as such was its agent, servant and/or employee, acting under color of law.

15) Defendant, Attorney JEANETTE WILLIAMS-WHITE, is the plaintiff in a lawsuit seeking $10,000,000.00 in damages from Michigan State Troopers Jay Morningstar and Theresa Maylone, and is the "duly appointed Representative of the Estate of Eric Williams," for purposes of that litigation. (Case No. 06-600803, Wayne County Circuit Court; 1/9/2006). Defendant, JEANETTE WILLIAMS-WHITE, was the aunt of decedent, Eric Williams.

## I. BACKGROUND

16) From 1991 through 1998, Jay Morningstar served in the United States Army as a Military Policeman and received numerous accommodations and awards. Jay Morningstar was honorably discharged from the United States Army in February 1998, from Fort Gordon, Georgia.

17) In or about February 1998, Jay Morningstar successfully completed specialized training at the Federal Law Enforcement Training Center, Glenco, Georgia.

18) From in or about March 1998, through in or about April 1999, Jay Morningstar was a federal corrections officer with the United States Federal Bureau of Prisons, Federal Correctional Institution, Milan, Michigan.

19) From July 1999, through December 1999, Jay Morningstar was a member of the 118th recruitment class of the Michigan Department of State Police Recruit School. Jay Morningstar successfully completed all requirements and graduated in or about November 1999.

20) From in or about December 1999, through January 2001, Trooper Morningstar was assigned to Post #35, of the Michigan Department of State Police (hereinafter MSP) in Flint, Michigan.

21) From in or about January 2001, through in or about January 2006, Trooper Morningstar was assigned to the Detroit Freeway Post #29 of the MSP in Detroit, Michigan.

22) In January 2006, Trooper Morningstar was reassigned to Post #24 of the MSP in Richmond, Michigan.

23) There has never been an internal investigation or negative administrative procedure initiated, brought, or instituted against Trooper Morningstar by either the MSP, the United States Federal Bureau of Prisons, or the United States Army.

24) During his service with the MSP, Trooper Morningstar received several unsolicited accolades from citizens, and has been awarded commendations from the MSP for his exemplary performance as a Michigan State Trooper.

25) Prior to April 14, 2005, and including all times employed by and in service with, the United States Army, the United States Federal Bureau of Prisons, and the MSP, Trooper Morningstar never discharged a firearm of any type against another individual.

26) On May 9, 2005, Jay Morningstar was charged with Count 1, Second-Degree Murder, MCL 750.317, and Count 2, Statutory Manslaughter, MCL 750.329, for a fatal

shooting that occurred while he was on duty on April 14, 2005. That marked the first time in the history of the MSP that a Trooper was charged with murder for an on-duty shooting.

27) James D. Gonzales was at all times relevant to this Complaint, an employee of the County of Wayne as a prosecuting attorney, and lead counsel in the matter of People v. Morningstar, Case Number 05-06400.

28) Robert J. Donaldson was at all times relevant to this Complaint, an employee of the County of Wayne as a prosecuting attorney, and co-counsel in the matter of People v. Morningstar, Case Number 05-06400.

29) The Honorable Ulysses W. Boykin presided over People v. Morningstar, Case Number 05-06400.

30) On November 28, 2005, a jury trial commenced in People v. Morningstar, Case Number 05-06400, in the Wayne County Circuit Court. The trial ended on January 5, 2006, when the jury returned its verdict of Not Guilty on Count 1, Second-Degree Murder, MCL 750.317, and Not Guilty on Count 2, Statutory Manslaughter, MCL 750.329.

31) At all times relevant to this Complaint, the area known as "Greektown," the City of Detroit, and the State of Michigan, were all within the legal jurisdiction of the Michigan Department of State Police. MSP troopers respond to calls for service in the City of Detroit on a daily basis and frequently assist the Detroit Police Department (DPD) in critical incidents and law enforcement emergencies at the request of the DPD.

32) At all times relevant to this Complaint, the area known as "Greektown," in Detroit, was within the jurisdiction of what was formerly known as the First Precinct of the DPD. The First Precinct of the DPD operated from 1300 Beaubien Street, Detroit, Michigan.

33) The Detroiter Bar is located at 655 Beaubien Street, Detroit, Michigan, and is on the southwest corner of the intersection of East Fort Street and Beaubien Street.

34) The Michigan Commission on Law Enforcement Standards (MCOLES) established minimal standards for all law enforcement agencies throughout the State of Michigan. By law, no person shall be employed as a law enforcement officer unless they fully comply with MCOLES training standards, and obtain certification from MCOLES that the individual officer has attained those standards in his or her MCOLES certified training.

35) Defendant, DPD Deputy Chief Deborah Robinson, was, at all times material to this Complaint, the supervisory individual in charge of training DPD officers. Despite her supervisory position in training officers with DPD, Defendant Deputy Chief Deborah Robinson is not a certified/licensed Michigan law enforcement officer, her MCOLES law enforcement license having lapsed on May 21, 2001.

36) The DPD defines "Officer in Charge (OIC)," as the officer in charge of, or responsible for, a "case or an investigation." The DPD OIC "shall notate on their Investigator's Log (DPD 250a) and document on a Witness Statement form (DPD 103), if applicable, the content and circumstances of all citizen contacts, interviews, interrogations, and conveyances during the shift the citizen contact interview, interrogation or conveyance occurred."

37) Defendants, Glenn Davis, James Tolbert, Kenneth Gardner, Tawnya King, and Charles Zwicker, all were DPD, Officers in Charge of Case Number 05-06400, at various times throughout the investigation and prosecution.

38) MSP Detective Sergeant Edward Price was the MSP, OIC, and was assigned to Case Number 05-06400.

39) At various times from 2003 through May 9, 2005, an acrimonious and contentious relationship existed at certain supervisory levels of the DPD and the MSP.

40) At various times from 2003 through May 9, 2005, an acrimonious and contentious relationship existed between the Defendant, Kym Worthy, and the MSP.

## II. FACTS

### *A) ON-DUTY SHOOTING, APRIL 14, 2005*

41) On April 13, 2005, Michigan State Trooper Theresa Maylone began her first day assigned to the MSP Detroit Freeway Post #29, after being previously assigned to the MSP Gaming Unit for approximately 5 ½ years. Trooper Maylone's duties and responsibilities in the MSP Gaming Unit were to enforce violations of law that occurred in and around the three casinos in Detroit, Michigan.

42) On April 13, 2005, at approximately 10:00 p.m., Troopers Morningstar and Maylone were on duty in their official capacity and assigned as shift partners. During that shift, Trooper Morningstar drove MSP patrol car #2921.

43) On April 14, 2005, at approximately 12:20 a.m., Trooper Morningstar and Trooper Maylone cleared a traffic stop near Brush Street in Detroit, and intended to return to I-375 to resume traffic enforcement.

44) Trooper Morningstar turned right (east bound) from Brush Street onto East Fort Street, Detroit. Once on East Fort Street, Trooper Morningstar saw a man standing in the middle of the street, later identified as Eric Williams. That man refused to yield to the marked MSP patrol car and remained in the middle of the street as the MSP patrol car approached.

45) DPD scout car #01, manned by Defendants Wheatley and Mix, arrived at the intersection simultaneously with the MSP patrol car. Defendants Wheatley and Mix positioned their car facing west on East Fort Street. The DPD scout car was equipped with an in-car camera digital and audio recorder that was mounted in the middle of the windshield and faced front. The DPD in-car camera captured portions of the incident on digital images (video) from the perspective of the DPD scout car (filming the back of Eric Williams), and not from the perspective of Trooper Morningstar, who was facing Eric Williams.

46) Trooper Morningstar observed that Eric Williams was engaged in an altercation with another person, who stood on the corner near the Detroiter Bar.

47) As the MSP patrol car came to a stop and Trooper Morningstar activated the vehicle's emergency lights, Eric Williams turned and, without hesitation, rapidly, aggressively, and directly advanced upon the driver's side of the MSP patrol car.

48) As Eric Williams advanced aggressively, Trooper Morningstar exited the MSP vehicle and repeatedly demanded in a clear, loud, direct, and authoritative voice, that Eric Williams "Stop," and show his hands to demonstrate that his intentions were not to physically confront, seriously injure, or kill Trooper Morningstar.

49) Eric Williams had a deranged, angry appearance, and bared his teeth, snarled and growled as he quickly advanced upon Trooper Morningstar.

50) Eric Williams ignored Trooper Morningstar's loud, and direct verbal commands and continued to aggressively advance towards Trooper Morningstar in a menacing and threatening manner.

51) Several civilian eye-witnesses told the DPD and prosecutors prior to charges being filed against Trooper Morningstar on May 9, 2005, that they heard or perceived Trooper Morningstar's loud and direct verbal warnings and commands ordering Eric Williams to stop.

52) At times during his aggressive and rapid approach, Eric Williams' hands disappeared completely from the view of Trooper Morningstar in a manner that was consistent with someone attempting to conceal a weapon.

53) Several civilian eye-witnesses told the DPD and prosecutors prior to charges being filed against Trooper Morningstar on May 9, 2005, that they observed Eric Williams advance upon Trooper Morningstar in an aggressive, threatening, and menacing manner.

54) Based upon the totality of the circumstances that confronted him at the time, Trooper Morningstar believed Eric Williams was armed with a weapon and intended to kill or seriously harm him.

55) Fearing for his safety, and in accordance with his training, Trooper Morningstar fired one shot to the "center mass" of Eric Williams to stop the threat. That shot killed Eric Williams.

56) Trooper Morningstar was forced to make a split-second judgment in circumstances that were tense, uncertain, and rapidly evolving, and his actions were consistent with those of a reasonable police officer confronted with that same situation, at that same scene, and at that same time.

57) Trooper Maylone, along with Defendants Wheatley and Mix, witnessed Trooper Morningstar search Eric Williams for weapons immediately after Trooper Morningstar fired and

then holstered his weapon, which indicated to all three officers that Trooper Morningstar believed Eric Williams was armed at the time he was shot.

58) Trooper Morningstar immediately rendered first aid to Eric Williams and was the only person who provided substantive medical assistance to Eric Williams prior to the arrival of the emergency medical services unit.

***B) INCIDENT REPORTS***

59) Trooper Morningstar prepared a report of the incident on April 17, 2005, (Report No. 0502902711.3) and stated therein:

a) When he turned his vehicle onto Fort Street he saw a man standing in the roadway who was engaged in a verbal altercation with a man standing on the sidewalk.

b) "The man [Eric Williams] was holding his right hand at his stomach area as if he had a weapon, and he was not moving from the roadway as the patrol car approached."

c) As soon as he "exited the driver's side, the man began to close the distance between us rapidly … and continued to hold his hand near his stomach as if holding something …."

d) "The man had a deranged, angry look to him and he was bearing [sic] his teeth and literally snarling as he advanced. I could hear strange noises like a growl as he closed in on me."

e) "Fearing for my safety, I drew my service weapon and ordered the man in a loud, clear voice to stop and show his hands."

f) "I kept repeating, 'Stop! Show me your hands, Stop!'"

g) "The man never reacted to my commands and kept charging toward me with his hand near his waist. As he was almost upon me, I fired my service weapon to stop him."

60) Consistent and corroborative with Trooper Morningstar's report, the video captured by the DPD scout car (see ¶45, above) clearly determined that Eric Williams did, in fact, have an object in his hand when he advanced upon Trooper Morningstar.

61) Several civilian eye-witnesses told the DPD and prosecutors prior to charges being filed against Trooper Morningstar on May 9, 2005, that, consistent and corroborative with Trooper Morningstar's report, they observed Eric Williams advance upon Trooper Morningstar in an aggressive, and threatening manner, and that Trooper Morningstar "needed to defend himself" in response.

62) Several civilian eye-witnesses told the DPD and prosecutors prior to charges being filed against Trooper Morningstar on May 9, 2005, that, consistent and corroborative with Trooper Morningstar's report, they observed that Trooper Morningstar did, in fact, command in a loud and direct voice to Eric Williams that he "Stop!"

63) That exculpatory evidence was known to DPD and prosecutors and was withheld from the magistrate who authorized the criminal complaint on May 9, 2005, and was withheld from the examining magistrate who conducted the preliminary examination on June 21, 2005.

64) Trooper Maylone prepared a report of the incident on April 14, 2005, (Report No. 0502902711.2) and stated therein:

a) When Trooper Morningstar turned onto Fort Street, Trooper Maylone observed a man she later came to know as Eric Williams in the middle of the street "pointing and screaming at the people standing on the sidewalk …"

b) When the troopers exited their vehicle "the subject was starting to approach the driver's side front of the patrol car."

c) Eric Williams "was advancing aggressively in a straight-line manner towards Trooper Morningstar."

d) Trooper Maylone "heard Trooper Morningstar repeatedly and loudly ordering the subject to 'Stop!'"

e) Eric Williams "was holding both his hands clenched in to [sic] fists and held tightly against his waist as if he was concealing something down the front waistband of his underwear."

f) "Based on [Eric Williams'] actions and the way his hands were positioned, I believed that the subject might have a weapon."

65) Consistent and corroborative with Trooper Maylone's report, the video showed that Eric Williams did, in fact, have an object in his hand when he advanced upon Trooper Morningstar.

66) Several civilian eye-witnesses told the DPD and prosecutors prior to charges being filed against Trooper Morningstar on May 9, 2005, that, consistent and corroborative with Trooper Maylone's report, that Trooper Morningstar did, in fact, command in a loud and direct voice to Eric Williams that he "Stop!"

67) Directly following the shooting, and consistent with good police procedure, Trooper Maylone and Trooper Morningstar were separated by MSP officials and ordered not to discuss the incident at anytime thereafter. Trooper Maylone and Trooper Morningstar prepared separate and independent reports, and neither trooper compared nor reviewed the other's report. Trooper Maylone and Trooper Morningstar did not view the DPD in-car camera video, or speak to anyone that had, prior to the completion of their respective reports.

68) Defendants Wheatley and Mix were not separated or questioned independently about the incident prior to the completion of their police reports. Further, Defendants Wheatley and Mix sat together in their scout car for approximately 3 ½ hours following the shooting and

discussed the shooting incident together. Defendants Wheatley and Mix reviewed the DPD in-car camera video many times prior to preparing and completing their reports.

69) Defendants Wheatley and Mix testified falsely that they did not compare their reports, that their reports were written independently from their own recollection of the events, and that their reports were prepared without outside influence.

70) Defendants Wheatley and Mix prepared separate reports that were virtually identical, and contained the same exact verbiage in the same exact order. Defendants' trial testimony that their reports are independent and unique to their independent recollections was false.

***C) STATEMENTS TO PROSECUTOR – INVESTIGATIVE SUBPOENA***

71) On April 16, 2005, at approximately 2:00 p.m., a patron who was in the Detroiter Bar on April 14, 2005, Edward Collica, gave a sworn statement to Assistant Prosecuting Attorney Robert Donaldson. Mr. Collica testified that:

a) He observed Eric Williams enter the bar at around 12:30 a.m., and that Eric Williams was "obviously, you know, drunk, on some drugs, mental issues ...." "Just the look in his eyes. Just, basically, the way he approached everyone in the bar and just the words, his speech, his actions."

b) When Williams was inside the bar, Mr. Collica testified that "I felt, you know, threatened in a sense. You know, I was defensive, you know, when a guy comes in behaving like that, you know."

c) Based on his "aggressive behavior" and "just the look in his face, his eyes, you know, trying to be intimidating," Mr. Collica was "sure" that Eric Williams intended to physically assault someone that night.

d) He had a clear unobstructed view of the street from the vantage point of the Fort Street side windows of the bar.

e) Eric Williams was aggressive, and after he was removed from the bar Williams, "picked up a brick, like, threw it at a taxi …."

f) "And he kinda got up and, like, threw the brick at the cab. And then that's when he like, kind of – you could tell he was hyped up and he was mad and he was very – you know, he was angry about this whole situation and he took out a couple of windows with his fist."

g) "And the DPD and state troopers kind of, like, rode up, like, simultaneously. And the guy just, like, kind of ran up on the trooper in, like, I'd say, you know, aggressive, like, threatening manner when the trooper decided to – you know, he needed to defend himself."

h) "It was not visible whether he [Williams] had anything in his hands or not."

i) Williams "walked up on [Trooper Morningstar] aggressively, like, kind of in a threatening manner and he got about as close as you can get, you know, the trooper told him, 'Freeze, freeze.' He didn't freeze and, I mean, the trooper defended himself, I would say."

j) Trooper Morningstar was "Commanding him to stop."

k) "He was coming at the trooper to fight with him and … Just the way he walked up on him, you know, like very aggressive and threatening."

72) On April 16, 2005, at approximately 2:20 p.m., a patron who was in the Detroiter Bar on April 14, 2005, Andrea Merritt, gave a sworn statement to Assistant Prosecuting Attorney Robert Donaldson. Ms. Merritt testified that:

a) Eric Williams "caused quite a commotion" inside the Detroiter and "was yelling and screaming, and at the end of the bar he had grabbed someone …."

b) "He was yelling and mumbling but it was very hard to know what he was saying." "It was just babbling." "He was, obviously, upset …."

c) After breaking the window, Eric Williams "was in the middle of the street and it sounded like he was still ranting and raving and yelling."

73) On April 18, 2005, at approximately 11:00 a.m., a patron who was in the Detroiter Bar on April 14, 2005, William Reed, gave a sworn statement to Assistant Prosecuting Attorney Robert Donaldson. Mr. Reed testified that:

a) He was grabbed from behind by Eric Williams "pinning my arms in a bear hug."

b) Eric Williams "seemed to be talking in what seemed to me like speaking in tongues. It was not a clear language. It was not English. It was not street talk."

c) "[Eric Williams] was intent on doing damage."

d) He witnessed Eric Williams breaking the windows of the Detroiter Bar.

e) He testified that he could see Eric Williams advance upon Trooper Morningstar clearly through the windows of the bar. "[O]bviously they were confronting him, and the physical indication suggested to me they were saying stop. Desist. Don't move. That type of thing."

74) On April 19, 2005, at approximately 2:20 p.m., Defendant Lisa Mix gave a sworn statement to Assistant Prosecuting Attorney Robert Donaldson. Defendant Mix testified that:

a) She knew Eric Williams from past experiences while on patrol.

b) Defendant Mix described the totality of events as:

> "Once [Eric Williams] started walking towards the trooper's vehicle, when we came close enough to it, the officer exited the vehicle along with his partner. … The officer drew his weapon. Aimed [sic] it, and shot Mr. Williams."

c) Defendant Mix testified she did not hear Trooper Morningstar say anything to Eric Williams before he shot Eric Williams.

75) On April 19, 2005, at approximately 3:00 p.m., Defendant Tyrine Wheatley gave a sworn statement to Assistant Prosecuting Attorney Robert Donaldson. Defendant Wheatley testified that:

a) He knew Eric Williams by name prior to April 14, 2005. "There were several incidents where I had the opportunity to either lock him up or take him to the hospital."

b) Defendant Wheatley described the totality of events as:

> "Mr. Williams approached the vehicle. The trooper walked around the door. He was initially behind the door, removing his firearm, from the holster and firing a shot."

c) Defendant Wheatley testified that he did not draw his weapon because, "I have a personal relationship with him, and I just didn't feel a danger there."

d) Defendant Wheatley testified he did not hear Trooper Morningstar say anything to Eric Williams before he shot Eric Williams. " ... I did not hear it."

76) On May 2, 2005, at approximately 11:20 a.m., Trooper Maylone gave a sworn statement to Assistant Prosecuting Attorney Robert Donaldson. Trooper Maylone testified that:

a) She "heard my partner [Trooper Morningstar] screaming, "Stop, stop, stop" as Eric Williams advanced toward Trooper Morningstar.

b) "And the man's face [Eric Williams], he looked deranged, he looked angry."

c) She believed that Eric Williams positioned his hands "like he was trying to conceal a weapon."

77) Defendants Wheatley and Mix both falsely stated, prior to charges being brought in this matter, they were both out of their police vehicle prior to the shooting, witnessed the shooting from outside of the car for several seconds prior to the shot, and that they did not hear Trooper Morningstar command, order, or direct Eric Williams to "Stop," "Show me your hands," or "Freeze freeze."

78) Defendants Wheatley and Mix did not disclose, prior to charges being brought in this matter that, in fact, they both were inside their police car at the time of he shooting; the windows of the car were up at the time of the shooting; and the radio was on at the

time of the shooting, contrary to their sworn statements, and in a grossly negligent, and malicious manner they allowed the erroneous inference to be made that they were able to hear whether Trooper Morningstar commanded Eric Williams to stop, when in truth and fact, they were not.

79) A DPD OIC was present during witness interviews and Investigative Subpoena statements; however MSP Detective Sergeant Edward Price, the designated MSP OIC assigned to the investigation, was intentionally excluded from interviews and Investigative Subpoena statements by the DPD and prosecutors. MSP Det. Sergeant Price was prevented from providing meaningful input in the investigation, and was prohibited by DPD from assisting the Defendants with the investigation.

80) On or about May 19, 2005, MSP Detective Sergeant Edward Price was informed directly by Defendant, DPD OIC Tawnya King, that she had direct orders from DPD superiors not to provide information, evidence, or reports to MSP.

***D) <u>IN-CAR CAMERA VIDEO</u>***

81) DPD scout car #01, manned by Defendants Wheatley and Mix, was equipped with an in-car camera digital and audio recorder that was mounted in the middle of the windshield and faced front. That in-car camera captured portions of the events that occurred before, during, and after the shooting, but Defendants Wheatley and Mix purposely did not turn on the audio recorder. Approximately 26 minutes of digital images (hereinafter "video") were recorded from DPD scout car #01 on April 14, 2005. However, significant portions of the video are unable to be viewed at all, much less, clearly; digital frames within the video are totally absent; the image of Eric Williams completely disappears in key sections of the video; the video is incapable of

being enhanced; the time indicator skips several seconds throughout, and the overall quality of the video is extremely poor.

82) Defendants Wheatley and Mix were not properly trained in the use of the in-car camera system, and were grossly negligent when they purposely failed to activate the audio recorder on April 14, 2005.

83) Immediately after the shooting, from approximately 1:00 a.m. through approximately 4:30 a.m., the in-car camera video of the incident was viewed extensively and reviewed repeatedly in the patrol car by several members of the DPD at the scene.

84) Following their shift, Defendants Wheatley and Mix reported that the video downloaded properly onto the main server at Precinct 1.

85) On April 14, 2005, DPD Sgt. Rodney Sizemore was informed by Defendant OIC Gardner that the video did not download properly from DPD patrol car #01.

86) DPD Sgt. Sizemore manually downloaded the video segment directly from DPD scout car #01. Sgt. Sizemore then transferred the video image onto a laptop computer.

87) The original video was purposefully deleted and permanently erased by DPD.

88) DPD Sgt. Sizemore maintained a copy of the video evidence on a CD which "was misplaced" for some time. DPD Sgt. Sizemore kept the copy in his unsecured office after his shift ended.

89) DPD Sgt. Sizemore testified he had the ability to alter, change and/or modify the original copy he maintained.

90) On April 14, 2005, 5 copies of the video were provided to Defendant Gardner, and several additional copies were provided to individuals throughout the DPD, including

Defendant Tolbert; DPD Assistant Chief Martin (3 copies); DPD Deputy Chief George Hall and DPD Chief Bully-Cummings. Although requested by MSP, no copies were provided to MSP.

91) Defendants did not subject the video to expert analysis, nor did they carefully review the video themselves.

92) Defendants were grossly negligent and deliberately indifferent in not having the video analyzed by an expert, or not carefully reviewing the video themselves. The video was heavily relied on by the DPD and the Wayne County Prosecutor's Office as dispositive on the issue of the malicious intent of Trooper Morningstar, despite the fact that the video shows Eric Williams from the back, and not from the perspective of what Trooper Morningstar saw and perceived of Eric Williams; the video shows that it took only approximately 5 seconds for Eric Williams to reach Trooper Morningstar, and not 30-40 seconds, as Defendant Wheatley falsely testified; the video shows that Eric Williams had an object in his hand, as Trooper Morningstar feared; and the video demonstrates that Defendants Wheatley and Mix were inside of DPD scout car #01 when the shot was fired, and not outside, as they both falsely testified.

***F) PRELIMINARY EXAMINATION***

93) On June 21, 2005, a preliminary examination was held in People v. Morningstar, Case Number 05-06400, by the Honorable Joseph N. Baltimore.

94) Defendant Wheatley was the main prosecution witness at the preliminary exam.

95) Defendant Wheatley testified that the in-car camera system was working properly (including audio) and the video from the camera was a fair and accurate depiction of the events as they occurred on April 14, 2005.

96) Defendant Wheatley testified that:

a) Eric Williams approached Trooper Morningstar's patrol car, "and the trooper got out of the vehicle and walked around the vehicle's door and fired one shot," drawing the inference that Trooper Morningstar shot Eric Williams without reason or justification.

b) Prior to the shot being fired, Wheatley said he exited the DPD scout car and made his observations from outside the vehicle.

Gonzales attempted to emphasize this point with leading questions in his direct examination of Defendant Wheatley:

Gonzales: When you got out of the vehicle did you go in the general direction of the individual in the street; in other words, did you walk that way?

Wheatley: I walked in that direction, yes.

Gonzales: And were you outside the car when you made the observations that Mr. Morningstar shot and fired his weapon?

Wheatley: Yes.

Gonzales: So you weren't inside the car; you were outside of it?

Wheatley: Yes.

Gonzales: You were on foot?

Wheatley: Yes.

97) Defendant Wheatley falsely testified that he was outside the car at the time Eric Williams advanced upon Trooper Morningstar, and thereby misled the examining magistrate to believe that Trooper Morningstar did not give verbal commands to Eric Williams prior to the shooting. Gonzales emphasized this point through Defendant Wheatley:

Gonzales: I'll repeat the question for you, Officer. At any point in time as you are in your vehicle get out of your vehicle or as you approached the scene and observed the shots being fired do you hear Officer Morningstar say anything?

Wheatley: No.

Gonzales: Do you hear the man with his pants down say anything?

Wheatley: No.

98) Gonzales emphasized the importance of the video for the probable cause determination:

> What should be considered your Honor, is the fact that we have a clear videotape of an individual in a very short period of time who makes a direct action of coming out of his vehicle, stepping around the car, pulling his weapon, shooting an individual who does nothing more than walk upon him. That's my opinion, Judge, overkill and I would ask your Honor to bind the defendant over.

99) The Wayne County Prosecutor's Office possessed the full video (approximately 26 minutes) and disclosed only approximately 30 seconds of that video to the defense prior to the preliminary examination.

100) The portion of the video not disclosed to the defense at the time of the preliminary examination clearly showed that Eric Williams did, in fact, have an object in his hand when he advanced upon Trooper Morningstar.

101) The DPD and prosecutors used select portions of the video in erroneously establishing probable cause when they knew or should have known that the video showed that Eric Williams' hand repeatedly moved toward the pockets of his jacket, as stated in Trooper Morningstar's report, and that same hand held an object as Williams advanced upon Trooper

Morningstar at the time he was shot. That object in the hand of Eric Williams was neither recovered nor recorded in evidence, although the video clearly shows the object on the street.

102) When Gonzales argued to the examining magistrate that there was probable cause to bind the matter over, he relied on the false testimony of Defendant Wheatley that Defendant Wheatley was outside the car; that he observed the approach of Eric Williams for 30-40 seconds; that Trooper Morningstar gave no verbal commands to Eric Williams; and that Eric Williams did not have an object in his hand when he advanced upon Trooper Morningstar.

103) Judge Baltimore found probable cause to bind over Trooper Morningstar for trial based on the false testimony of Defendant Wheatley. As a basis in determining probable cause, Judge Baltimore relied on:

a) "Testimony,"

b) That there was nothing to suggest that Trooper Morningstar was threatened by Eric Williams, and

c) "That there was simply no justification on the record for me to conclude otherwise."

104) Had Defendant Wheatley testified truthfully, that is, that the actual time it took Eric Williams to reach Trooper Morningstar was approximately 5 seconds and not 30-40 as he falsely testified, Judge Baltimore would have considered the extremely short period of time Trooper Morningstar had to make the critical decision in a tense, uncertain, and rapidly evolving circumstance.

105) Had Defendant Wheatley testified truthfully, that is, that he was inside the car during the approach of Eric Williams and up to and until after Eric Williams was shot; that the radio was on; and that the windows were up and sealed, Judge Baltimore would not have

drawn the erroneous conclusion that Trooper Morningstar did not, in fact, issue verbal commands to Eric Williams.

106) Had Defendant Wheatley testified truthfully that he knew Eric Williams was a threat, in that:

a) He had violent confrontations with Eric Williams previous to April 14, 2005;

b) That he was aware that Eric Williams had a reputation for violence; and

c) That he was aware that Eric Williams had a reputation for aggression;

Judge Baltimore would have concluded that there was no 'probable cause' for the accusation that Trooper Morningstar committed Murder Second-Degree or Manslaughter for the on-duty shooting of Eric Williams on April 14, 2005.

107) Judge Baltimore was deprived of the opportunity to weed out groundless or unsupported charges of grave offenses, and to relieve Trooper Morningstar of the degradation and the expense of a criminal trial and of the deprivation of his liberty because of the pervasive use of false and misleading testimony and the withholding of facts at the preliminary exam.

***G) <u>CRIME SCENE</u>***

108) On or about April 14, 2005, it was the understanding of the MSP at the time of the incident, that all critical incidents involving the MSP that occurred in the City of Detroit, to include incidents where an MSP member fired his weapon, would be investigated by the MSP.

109) Following the shooting, a serious and acrimonious conflict arose between the MSP and the DPD regarding which entity controlled the scene for the purposes of securing the integrity of the scene; collecting evidence; maintaining evidence; processing evidence;

conducting interviews and taking statements; and who had responsibility for the investigation of the incident.

110) A DPD Inspector at the scene ordered "DPD personnel to secure the scene and dismiss MSP." When the DPD Inspector was asked by an MSP Sergeant to await higher level command directions as to which department would control the scene, the Inspector responded, "Fuck that, it's ours," and "it's our city," indicating gross negligence, deliberate indifference, and extreme malice towards the MSP and Trooper Morningstar.

111) Approximately 30 minutes after the shooting of Eric Williams, a DPD homicide investigator said at the scene, "This is a homicide and I'm charging him with murder," indicating gross negligence, deliberate indifference, and extreme malice towards the MSP and Trooper Morningstar.

112) Following the shooting, the crime scene was controlled by the DPD, and crime scene integrity; evidence collection; crime scene analysis; photographs; witness interviews; canvassing of witnesses; crime scene sketches; measurements; and crime scene security were all controlled by the DPD.

113) On April 14, 2005, then OIC, Defendant Charles Zwicker, falsely and maliciously reported that there "was little or no cooperation from the Michigan State Police at the scene which included refusal to turn over witnesses and evidence, or even answer basic questions when asked. … The MSP brass has refused to turn over the trooper's weapon and the decedents [sic] clothing. There have been no reports turned over to the OIC."

114) On May 19, 2005, OIC Defendant King advised MSP Det. Sgt. Ed Price that the DPD "still have orders not to release anything to the Michigan State Police." (See ¶80, above).

115) On April 26, 2005, Deputy Chief Hall disseminated an email regarding "crime scenes" to other members in the DPD. The email was in response to the events on April 14, 2005, and instructed the recipients of the email to:

> … pass down to your troops the fact that "ALL" crime scenes within the city of Detroit, are the investigatory responsibility of this Department, REGARDLESS OF WHO IS INVOLVED, unless otherwise directed by the Chief. As such, the initial responding DPD units to all crime scenes must IMMEDIATELY secure that scene (with yellow tape) and PROHIBIT any unauthorized individuals from entering the scene and/or collecting any evidence. Potential violators must be made awear [sic] that they risk being ARRESTED if they try and gain access to any crime scene that is secured by this Department. The DPD conducts investigations relative to crimes that are committed within this city period. (Emphasis in original).

116) The object in the hand of Eric Williams at the time he was shot is clearly visible on the video, but that object was not recovered or identified by the DPD.

117) The crime scene was not secured properly by the DPD. A trooper at the scene observed "a drunken vagrant walk[ed] pass [sic] DPD personnel, into the crime scene and lay himself down next to the shot suspect. MSP personnel had to remove him."

118) The DPD was grossly negligent and deliberately indifferent and failed to follow the most basic police procedures in, among other things, not properly securing the crime scene to prevent the loss of evidence; corruption of evidence; taint of evidence, and in allowing non-authorized individuals to enter the scene, risking contaminating or removing evidence from the crime scene.

***H) CIVIL LAWSUITS AGAINST TROOPER MORNINGSTAR***

***i) FIRST CIVIL LAWSUIT***

119) On April 18, 2005, a civil lawsuit was filed in United States District Court, Eastern District of Michigan, Southern Division, on behalf of Richard Miller, "personal representative for the Estate of Eric Williams." That complaint falsely alleged, among other things, that "Trooper Morningstar made, fabricated and disseminated false accounts," regarding the shooting of Williams and "refused to render immediate aid to Eric Williams by not rendering immediate medical attention." Richard Miller v. Jay Morningstar, E.D.Mich. 05-40123, (April 18, 2005).

***ii) SECOND CIVIL LAWSUIT***

120) On April 28, 2005, a civil lawsuit was filed in the Circuit Court for the County of Wayne, on behalf of Richard Miller, "personal representative for the Estate of Eric Williams." Richard Miller v. Jay Morningstar, 05-512845 (April 28, 2005).

121) In a court pleading, filed August 26, 2005, Assistant Prosecuting Attorney James Gonzales represented that the 1st and 2nd lawsuits were dismissed after "DNA testing was performed showing that the initial litigant [Richard Miller] was unrelated to [Eric] Williams …."

122) On or about August 26, 2005, Assistant Prosecuting Attorney James Gonzales having prior knowledge of the intentions of Defendant Attorney Jeanette Williams-White to file a civil lawsuit against Trooper Morningstar, represented in a court pleading, that the "only potential litigant … is Jeanette Williams-White."

123) On May 9, 2005, "Tayana Williams," a sister of Eric Williams, referred to the lawsuit filed by Richard Miller as "clearly money-grabbing." Attorney Johnny Hawkins represented Eric Williams' family member, "Tayana Williams" at that time.

***iii) THIRD CIVIL LAWSUIT***

124) On January 9, 2006, a civil lawsuit was filed in the Circuit Court for the County of Wayne, on behalf of Defendant Attorney Jeanette Williams-White "as the duly appointed Representative of the Estate of Eric Williams." Jeanette Williams-White vs. Michigan State Police Officer Jay Morningstar and Michigan State Police Officer Theresa Malone [sic], 06-600803 (1/9/2006). Attorney Johnny Hawkins, who represented family member, "Tayana Williams" on May 9, 2005, is an attorney of record, representing Defendant Attorney Jeanette Williams-White.

***I) PUBLIC STATEMENTS***

125) Immediately following the shooting of Eric Williams, Williams' family members publicly protested the shooting of Eric Williams and placed pressure on the Wayne County Prosecutor's Office and the DPD to charge Trooper Morningstar with Murder for the on-duty shooting of Eric Williams.

126) On or about April 15, 2005, Defendant Attorney Jeanette Williams-White referred to Eric Williams' actions immediately before the shooting and made a false and malicious statement to the media that Eric Williams, "was sitting on the stoop over there. The state police called him over to the car." "[A] cab driver said he heard a shot and he saw the young man was laying [sic] in the street dead."

127) On or about April 16, 2005, Defendant Attorney Jeanette Williams-White commented publicly that the shooting on April 14, 2005, was "one of the most outrageous incidents I have ever heard of" and that "[t]he officer needs to be charged with first-degree murder."

128) The statements referred to in ¶¶ 126 and 127, above, implied, falsely and maliciously, that Trooper Morningstar asked Eric Williams, who was previously reclining on a stoop, to come to the MSP vehicle, and when Williams approached as instructed, Trooper Morningstar shot and killed him without cause or justification. Those false and malicious statements were disseminated in print and electronic media throughout the Detroit Metropolitan area.

129) In or about April 2005, a public "rally" was held on Beaubien Street, Detroit, to protest the shooting of Eric Williams.

130) Defendant Attorney Jeanette Williams-White and other family members of Eric Williams met with prosecutors prior to May 9, 2005, and publicly pressured prosecutors to charge Trooper Morningstar with Murder.

131) On or about April 28, 2005, Defendant Attorney Jeanette Williams-White met with Assistant Prosecuting Attorney James D. Gonzales to complain that she believed the decision to charge Trooper Morningstar was unduly delayed, thereby publicly pressuring the Wayne County Prosecutor's Office to charge Trooper Morningstar.

132) Following the meeting on or about April 28, 2005, with Assistant Prosecuting Attorney James D. Gonzales, Defendant Attorney Jeanette Williams-White publicly complained that Trooper Morningstar received different treatment than that of a non-police

officer and said that Assistant Prosecuting Attorney James D. Gonzales "told me to be patient and I hit the roof …."

133) On or about May 9, 2005, "Tanya Williams," Eric Williams' sister, told a news reporter, "I am sorry that it had to take so long. I mean, we stayed down here and called constantly every other day."

134) Eric Williams' family members waited outside of the Frank Murphy Hall of Justice on May 9, 2005, wearing black T-Shirts with the word "Why?" and Williams' photo.

## II. CRIMINAL CHARGES FILED

### People v. Morningstar, Case Number 05-06400

135) Defendants were grossly negligent and deliberately indifferent when they refused to apply the Constitutionally mandated standard to Trooper Morningstar which requires that the "reasonableness" of whether the amount of force necessary in a particular situation must be judged from the perspective of a reasonable officer on the scene, under the same circumstances, rather than with the 20/20 vision of hindsight.

136) Defendant Worthy required DPD and Assistant Prosecuting Attorney Robert Donaldson to submit the results of the investigation to her by May 6, 2005.

137) On or about May 9, 2005, Defendant Worthy stated publicly that the charges were brought "after a thorough investigation …." Contrary to her public assertions, she knew, or should have known, the investigation was neither thorough nor complete.

138) On or about May 9, 2005, Defendant Worthy gave a press conference and said about the video: "It helped us make our decision in what our charges should be." "We feel that we can show and prove beyond a reasonable doubt Murder in the second degree."

139) On or about May 9, 2005, Defendant Worthy stated publicly that "[t]he video was very valuable in making our decision ...."

140) The media statements by Defendant Worthy gave enormous undue weight to an erroneous, biased interpretation of the evidence and commented on the identity and nature of the evidence expected to be presented in a proceeding that could result in incarceration.

141) Defendant Worthy was malicious and grossly negligent in her statements to the media when she rendered an opinion as to the guilt of a defendant or suspect in a criminal case or proceeding that could result in incarceration, in violation of, among other things, the Michigan Rules of Professional Conduct, specifically Rules 3.8 and 3.6.

142) On May 9, 2005, within just three weeks of the on-duty shooting of Eric Williams, Trooper Jay H. Morningstar was charged with Count 1, Second-Degree Murder, MCL 750.317, and Count 2, Statutory Manslaughter, MCL 750.329.

143) Unlike every other on-duty police shooting that preceded it in Wayne County, Trooper Morningstar's bond was set at $200,000.00, 10% of which was required prior to his release from incarceration. No officer charged with a crime for a duty related shooting in Wayne County, other than Trooper Morningstar, has been required to post a monetary bond, and has been released on their personal recognizance.

144) The prosecution opposed Trooper Morningstar's request for reduction of bond, and in doing so, maliciously represented that Trooper Morningstar possessed a dangerous "mindset instilled in [him] through years of military and police training," dishonoring those who serve their country and protect their community.

## III. WHAT DEFENDANTS KNEW OR SHOULD HAVE KNOWN ABOUT ERIC WILLIAMS PRIOR TO CHARGING

145) Eric Williams' history of violent, aggressive, and erratic behavior routinely manifested itself in his contacts with the public.

146) Prior to April 14, 2005, Eric Williams had a consistent history of violence, mental illness, alcoholism, and drug abuse.

147) Family members of Eric Williams publicly stated that he suffered from an extensive history of mental illness.

148) Defendants Mix and Wheatley had repeated contacts with Eric Williams prior to April 14, 2005, and believed that Eric Williams possessed violent tendencies and demonstrated aggressive and erratic behavior. Eric Williams' violent tendencies and aggressive and erratic behavior were well-known to Defendants Mix and Wheatley prior to April 14, 2005.

149) On at least one occasion, Defendant Wheatley used his DPD issued oleoresin capsicum spray (pepper spray) to subdue a violent Eric Williams during an arrest.

150) Prior to April 14, 2005, it was well-known by many officers from the First Precinct of DPD, that Eric Williams was, at times, violent and dangerous and was a threat to officer safety.

151) Prior to April 14, 2005, it was well-known by many local business people from the Greektown area of Detroit, that Eric Williams was, at times, violent and dangerous and was a threat to the safety of the community.

152) Prior to April 14, 2005, Eric Williams attempted to disarm a DPD officer and struggled to take the officer's service weapon from its holster.

153) Prior to April 14, 2005, Eric Williams approached a DPD officer who was in her police vehicle and fashioned his hand as if he possessed a gun. Eric Williams then placed his hand to the head of the officer and acted as if he pulled the trigger.

154) Prior to April 14, 2005, Eric Williams fashioned his hand as if he possessed a gun and threatened a local businessman in Greektown and placed his hand to the head of the businessman and acted as if he pulled the trigger.

155) Prior to April 14, 2005, Eric Williams slashed the throat of another homeless man with a box cutter to such a serious degree that the man almost died as a result of his wounds.

156) Prior to April 14, 2005, Eric Williams stabbed a man on a public bus several times in the head with a fork.

157) Prior to April 14, 2005, Eric Williams drew a knife on the manager of a homeless shelter, threatened the manager and others and was permanently banned from the shelter.

158) On April 13, 2005, from approximately 6:00 p.m. through approximately 11:59 p.m., Eric Williams engaged in violent, aggressive, and erratic behavior, and accosted several citizens in the vicinity of the Detroiter Bar.

159) On April 13, 2005, at approximately 11:00 p.m., Eric Williams aggressively approached a car for money at the intersection of East Fort and Beaubien. When the driver of the car refused to give Eric Williams money, Eric Williams brought his hand to his waist in a manner that indicated he possessed a weapon and, fearing for his safety, the driver of the vehicle ran a red light to flee the area.

160) Eric Williams' behavior resulted in over 140 police contacts, many of which demonstrated his violent, aggressive, and erratic behavior.

161) Prior to May 9, 2005, the erratic behavior and violent and aggressive tendencies of Eric Williams towards police and others was known or should have been known to the DPD and prosecutors and was intentionally and maliciously withheld in the probable cause presentations, both prior to the issuance of the warrant on May 9, 2005, and then later at the preliminary examination on June 21, 2005.

162) The information outlined in paragraphs 145 through 161 above, were known or should have been known to all parties involved in the process that resulted in charging Trooper Morningstar with Count 1, Second-Degree Murder, MCL 750.317, and Count 2, Statutory Manslaughter, MCL 750.329, in the matter of People v. Morningstar, case number 05-06400. Those charges were the first time a Michigan State Trooper was charged with Murder in connection with an on-duty shooting.

## IV. CONSENT JUDGEMENT

163) Defendants knew or should have known that the United States alleged that the "City [of Detroit] and the DPD are engaging in a pattern or practice of unconstitutional or otherwise unlawful conduct that has been made possible by the failure of the City and the DPD to adopt and implement proper management practices and procedures." The City of Detroit and the DPD agreed to address and correct these allegations regarding the DPD's unlawful conduct.

164) Defendants knew or should have known that the United States and the City of Detroit and the DPD entered into a Consent Judgment in 2003, that, among other things,

stated the "City is responsible for providing necessary support to the DPD to enable it to fulfill its obligations …."

165) Defendants knew or should have known that the United States and the City of Detroit and the DPD entered into a Consent Judgment in 2003, that, among other things, stated the "DPD and the City shall 'ensure full, thorough and complete investigations.'"

166) The City of Detroit has not provided necessary support to the DPD to enable the DPD to fulfill its obligations.

167) DPD is and has been non-compliant with the Consent Judgment since it was signed and ratified by the parties.

168) The City of Detroit and the DPD had an obligation to follow MCOLES standards, train DPD personnel, including Defendants, regarding the constitutional rights of all citizens, including Trooper Morningstar, to lawful Due Process and Probable Cause determinations for arrests and warrants.

169) The City of Detroit and the DPD at all times relevant to this complaint failed to comply with that obligation and had a custom or policy of acting with deliberate indifference to violations of the constitutional rights of those being investigated by DPD.

170) The City of Detroit and the DPD at all times relevant to this complaint had a custom or policy of failing to train Defendants regarding protection or violation of those constitutional rights.

171) The City of Detroit and the DPD at all times relevant to this complaint had a custom or policy of failing to train Defendants in what constitutes "probable cause."

172) The City of Detroit and the DPD at all times relevant to this complaint had a custom or policy of failing to train Defendants in maintaining and utilizing in-car video equipment.

173) The City of Detroit and the DPD at all times relevant to this complaint had a custom or policy of failing to train Defendants in "General Investigations of Police Actions," including but not limited to custom or policy of failing to revise general investigation policies; custom or policy of failing to determine who may conduct investigations; custom or policy of failing to determine prohibited methods; custom or policy of failing to determine report requirements; and custom or policy of failing to determine review requirements.

174) The City of Detroit and the DPD at all times relevant to this complaint had a custom or policy of failing to train DPD officers in interviewing and investigative techniques.

175) The City of Detroit and the DPD at all times relevant to this complaint had a custom or policy of failing to discipline DPD officers for violations of DPD manual directives.

176) The City of Detroit and the DPD at all times relevant to this complaint had a custom or policy of failing to determine, implement, or train DPD officers in "General Use Of Force Policies."

## V. STATUTORY AMENDMENT TO M.C.L. §750.329

177) On or about December 29, 2005, the People of the State of Michigan, through their Legislature, enacted an amendment to M.C.L. §750.329, exempting on-duty police officers from being charged with Statutory Manslaughter. This amendment was specifically enacted in response to charges brought against Trooper Morningstar by Defendant, Kym Worthy.

178) Adherence to the statutory mandate imposed by the Legislature to protect police officers involved in on-duty shootings from over-reaching prosecutors is therefore, required by law, following its enactment.

179) On or about January 3, 2006, Defendant, Kym Worthy, was notified of the amendment to M.C.L. §750.329, and was asked to dismiss the pending charge of Statutory Manslaughter against Trooper Morningstar.

180) Defendant, Kym Worthy, did not respond to the request of January 3, 2006, to dismiss the Statutory Manslaughter count against Trooper Morningstar, despite the clear intentions of the Michigan Legislature.

## COUNT I
## AVOIDANCE OF GOVERNMENTAL IMMUNITY

181) Trooper Morningstar hereby realleges and incorporates by reference paragraphs 1 through 180, as if fully set forth herein.

182) At all times relevant herein, the conduct of Defendants violated clearly established constitutional rights of Trooper Morningstar as set forth in this complaint.

183) At all time relevant to this complaint, Defendants' conduct was not reasonable and was a result of improper motive, malice, reckless disregard, deliberate indifference and/or intentional disregard for Trooper Morningstar's clearly established constitutional rights.

184) At all times relevant herein, Defendant Worthy was engaged in activities that were not closely connected to the prosecutor's role in judicial proceedings or role as advocate in

that the actions complained of involved investigative, advisory functions and/or involved instances where the prosecutor did not have authority to exercise discretion.

**COUNT II**
**GROSS NEGLIGENCE**

185) Trooper Morningstar hereby realleges and incorporates by reference paragraphs 1 through 184, as if fully set forth herein.

186) These Defendants, by their actions and omissions, were engaging in conduct so reckless that it demonstrated a substantial lack of concern based upon whether an injury would result to Trooper Morningstar for gross negligence. The particulars of gross negligence include, but are not limited to the following:

a) Proceeding as the investigating agency knowing that the Detroit Police Department was not in compliance with Consent Decree 03-72258 regarding proper training, discipline, investigative methods, definitions of probable cause, supervision of Defendants, or interrogation of witnesses.

b) Refusing to apply the Constitutionally mandated standard to Trooper Morningstar which requires that the "reasonableness" of whether the amount of force necessary in a particular situation must be judged from the perspective of a reasonable officer on the scene, under the same circumstances, rather than with the 20/20 vision of hindsight.

c) Proceeding with a criminal investigation when no crimes had been committed.

d) Not reasonably investigating the underlying matter.

e) Failing to recover, and secure critical exculpatory evidence.

f) Withholding and falsifying critical exculpatory evidence from the authorizing magistrate at the initiation of proceedings.

g) Falsifying and withholding evidence to establish probable cause.

187) As the direct and proximate result of the gross negligence of these Defendants, Trooper Morningstar suffered the damages set forth within this Complaint, which are hereby incorporated by reference.

WHEREFORE, Plaintiff demands judgment against the Defendants, for compensatory and exemplary damages in excess of $75,000.00 together with costs, interest, and attorneys' fees, and whatever additional relief this Court finds equitable and just.

## COUNT III
## MALICIOUS PROSECUTION - STATE CLAIM

188) Trooper Morningstar hereby realleges and incorporates by reference paragraphs 1 through 187, as if fully set forth herein.

189) Defendants, in a grossly negligent manner, caused an underlying criminal prosecution for Second-Degree Murder and Statutory Manslaughter, Wayne County Circuit Court, Case No. 05-06400, with malice, knowing full well that no crimes had been committed by Trooper Morningstar.

190) There was no probable cause for initiating or continuing the underlying prosecution.

191) Probable cause for initiating and continuing the prosecution was maliciously based upon false and fraudulent evidence, and based upon an incomplete presentation of exculpatory evidence to the authorities.

192) The underlying prosecution was initiated and continued with malice for a primary purpose other than bringing an offender to justice.

193) MCLA 600.2907, MSA 27A 2907 provides for civil and criminal liability for every person who, for vexation, trouble, or with malice, causes another to be arrested, attached, or in any way proceeded against by any process of civil or criminal action without that person's consent.

194) The underlying criminal prosecution terminated in favor of Trooper Morningstar when a jury acquitted him of Second-Degree Murder and Statutory Manslaughter on January 5, 2006.

195) As the direct and proximate result of the above, and the actions of Defendants as herein described, Trooper Morningstar did and will continue to suffer damages, including, but not limited to the following:

a) Emotional pain and suffering.

b) Severe and serious mental anguish.

c) Harm to his professional reputation.

d) Harm to his reputation in the community.

e) Loss of preferred assignment to Detroit Freeway Post 29, Detroit, Michigan.

f) Lost wages.

g) Loss of marital consortium.

h) Loss of trust in the Office of Wayne County Prosecuting Attorney to fairly evaluate any future incident that involves use of force.

i) Fear of reprisal from the Office of the Wayne County Prosecuting Attorney.

j) Fear of reprisal from the Detroit Police Department.

k) Attorney fees and costs.

WHEREFORE, Plaintiff demands judgment against the Defendants, for compensatory and exemplary damages in excess of $75,000.00 together with costs, interest, and attorneys' fees and whatever additional relief this Court finds equitable and just.

**COUNT IV**
**DEFAMATION**

196) Trooper Morningstar hereby realleges and incorporates by reference paragraphs 1 through 195, as if fully set forth herein.

197) Defendant Worthy owed Trooper Morningstar the duty of not defaming Trooper Morningstar during the underlying course of events.

198) On or about May 9, 2005, Defendant Worthy rendered an opinion that Trooper Morningstar was guilty of Murder when she knew full well that the actions of Trooper Morningstar that were in question did not constitute Murder, and by rendering an opinion in the media as to the guilt of Trooper Morningstar, and commenting on evidence of guilt in a pending criminal matter that could result in incarceration, she defamed Trooper Morningstar.

199) Defendant Worthy was not engaging in an administrative, investigatory, or adversarial capacity when she defamed Trooper Morningstar in the media.

200) Defendant Worthy is therefore liable to Trooper Morningstar for defamation.

201) As a direct and proximate result of the conduct of Defendant Worthy, Trooper Morningstar suffered damages enumerated above of this complaint, which are hereby incorporated by reference.

WHEREFORE, Plaintiff demands judgment against the Defendants, for compensatory and exemplary damages in excess of $75,000.00 together with costs, interest, and attorneys' fees and whatever additional relief this Court finds equitable and just.

**COUNT V**
**VIOLATION OF 42 U.S.C. § 1983**
**DEPRIVATION OF CIVIL RIGHTS**
**MONELL POLICY CLAIM**

202) Trooper Morningstar hereby alleges and incorporates by reference paragraphs 1 through 201, as if fully set forth herein.

203) Defendants acting under color of law deprived Trooper Morningstar of his rights under the Fourth and Fourteenth Amendments to the United States Constitution and under the Constitution of the State of Michigan, Article I, Section 2.

204) Defendants owed to Trooper Morningstar a duty to exercise ordinary care in the discharge of responsibilities as police officers, and not to engage in any conduct which would deprive Plaintiff of his civil rights.

205) The actions of Defendants were done with deliberate indifference and pursuant to one or more policies, practices, and/or customs of the Defendant City of Detroit, its Police Department and Police trainer, Defendant Deborah Robinson.

206) At all times material to this complaint, Defendant City of Detroit and its Police Department and Police trainer, Defendant Deborah Robinson had policies, practices, procedures, and customs that included, among other things, failing to properly train, supervise, discipline, monitor, counsel and/or otherwise control Defendants and employees so as not to abuse the civil rights of Trooper Morningstar and other citizens.

207) The inadequacy of the training and supervision maintained and implemented by the policies, practices, procedures and customs is the result of deliberate indifference of Defendant City of Detroit and its Police Department, who willfully refused, and with deliberate indifference, failed to comply with United States District Court, Eastern District of Michigan, Consent Decree 03-72258.

208) The failure to train amounts to deliberate indifference to the rights of Trooper Morningstar and the training deficiency caused the ultimate injury to Trooper Morningstar, those injuries being set forth above.

209) Trooper Morningstar has suffered damages as previously enumerated above, which are hereby incorporated by reference.

WHEREFORE, Plaintiff demands judgment against the Defendants, for compensatory and exemplary damages in excess of $75,000.00 together with costs, interest, and attorneys' fees and whatever additional relief this Court finds equitable and just.

## COUNT IV
## DEFAMATION

210) Trooper Morningstar hereby realleges and incorporates by reference paragraphs 1 through 209, as if fully set forth herein.

211) Defendant, Jeanette Williams-White, owed Trooper Morningstar the duty of not defaming Trooper Morningstar during the underlying course of events.

212) On or about April 15, 2005, Defendant Attorney Jeanette Williams-White referred to Eric Williams' actions immediately before the shooting and made false and malicious statements to the media that, among other things, Eric Williams "was sitting on the stoop over

WHEREFORE, Plaintiff demands judgment against the Defendants, for compensatory and exemplary damages in excess of $75,000.00 together with costs, interest and attorneys' fees and whatever additional relief this Court finds equitable and just.

Respectfully submitted,
CONVERTINO & ASSOCIATES, PLLC

By: ______________________________

Richard G. Convertino (P62829)
Lenore M. Ferber (P24223)
Attorneys for Plaintiff
801 W. Ann Arbor Trail, Ste. 233
Plymouth, MI 48170
Phone: 734-905-4522

Dated: March 14, 2006

**DEMAND FOR JURY TRIAL**

Plaintiff, Jay Harrison Morningstar, by and through his attorneys, Convertino & Associates, PLLC, hereby requests a trial by jury in this matter.

Respectfully submitted,
CONVERTINO & ASSOCIATES, PLLC

By: ______________________________

Richard G. Convertino (P62829)
Lenore M. Ferber (P24223)
Attorneys for Plaintiff
801 W. Ann Arbor Trail, Ste. 233
Plymouth, MI 48170
Phone: 734-905-4522

Dated: March 14, 2006

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

County in which this action arose Wayne

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
Morningstar, Jay Harrison

**DEFENDANTS** CITY OF DETROIT; DETROIT POLICE DEPT.; WAYNE COUNTY PROSECUTOR WORTHY, KYM L.; DETROIT POLICE DEPT. DEPUTY CHIEF ROBINSON, DEBORAH; DETROIT POLICE DEPT. OFFICERS TOLBERT, JAMES, DAVIS, GLENN; GARDNER, KENNETH; KING, TAWNYA; ZWICKER, CHARLES; WHEATLEY, TYRINE AND BRYSON, LISA; AND WILLIAMS-WHITE, JEANETTE

**(b)** County of Residence of First Listed Plaintiff Macomb
(EXCEPT IN U.S. PLAINTIFF CASES)

36099

County of Residence of First Listed Defendant Wayne
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Convertino & Associates, PLLC, 801 W. Ann Arbor Trail, Suite 233, Plymouth, MI 48170; Phone: 734-905-4522
Richard G. Convertino (P62829) and Lenore M. Ferber (P24223)

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Select One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☑ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITI**[ZENSHIP] (Fo[r]
Citizen [o]
Citizen [o]
Citizen or Subject of a Foreign Country ☐ 3 ☐ 3 Foreign Nation ☐ 6 ☐ 6

Case: 2:06-cv-11073
Assigned To: Edmunds, Nancy G
Referral Judge: Whalen, R. Steven
Filed: 03-14-2006 At 11:13 AM
CMP MORNINGSTAR V. CITY OF DETROIT, ET AL (TAM)

**IV. NATURE OF SUIT** (Select One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

440

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ■ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
- Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Select One Box Only)

☑ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):
42 USC 1983
Brief description of cause:
Civil violations of Constitutional rights

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
**DEMAND $** $75,000.00
CHECK YES only if demanded in complaint.
**JURY DEMAND:** ☑ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE ____ [DOCKE]T NUMBER ____

DATE
March 14, 2006

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # ____ AMOUNT ____ APPLYING IFP ____ JUDGE ____ MAG. JUDGE ____

# PURSUANT TO LOCAL RULE 83.11

1. Is this a case that has been previously dismissed?

☐ Yes
☑ No

If yes, give the following information:

Court: ______________________________

Case No.: ______________________________

Judge: ______________________________

2. Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)

☐ Yes
☑ No

If yes, give the following information:

Court: ______________________________

Case No.: ______________________________

Judge: ______________________________

Notes :