STATE OF MICHIGAN

IN THE WAYNE COUNTY PROSECUTOR'S OFFICE

RE: INVESTIGATION INTO THE HOMICIDE OF ERIC WILLIAMS

No. 05-008

_____________________________________/

The sworn statement of POLICE OFFICER LISA MIX taken on Tuesday, April 19, 2005, at the Wayne County Prosecutor's Office located at the Frank Murphy Hall of Justice, 1441 St. Antoine, Detroit, Michigan.

APPEARANCES:

WAYNE COUNTY PROSECUTOR'S OFFICE
1441 St. Antoine
Detroit, Michigan 48226
(BY: ROBERT DONALDSON, ESQ.)

Appearing on behalf of the People

ALSO APPEARING:

OFFICER CHARLES WICKER
DETROIT POLICE DEPARTMENT

LORRAINE H. NAGY, CSMR 6060
COURT REPORTER

TAPPERT COURT REPORTING SERVICE, INC.

0001145

# I N D E X


| Witness/Proceedings | Page |
| --- | --- |
| Police Officer Lisa Mix | |
| Examination by Mr. Donaldson | 4 |


## EXHIBITS


| No. | Identification | Page |
| --- | --- | --- |
| No exhibits offered | | |




000140

Detroit, Michigan

Tuesday, April 19, 2005 - 2:20 p.m.

- - -

MR. DONALDSON: Today is April 19, 2005. It is approximately 2:20 p.m. We're here in the 12th floor conference room of the Frank Murphy Hall of Justice in the Office of the Wayne County Prosecutor.

We're here to take testimony into our file number 05-008, which is the investigation into the homicide of Eric Williams.

My name is Robert Donaldson. I'm assistant prosecuting attorney. I would ask the people here at the table to identify themselves for the record.

OFFICER WICKER: Charles Wicker, Detroit Police Department.

OFFICER MIX: Lisa Mix, Detroit Police Department, 1st Precinct.

MR. DONALDSON: Ma'am, you and I had a discussion before we got started about what you might expect; is that correct?

OFFICER MIX: Yes.

MR. DONALDSON: I inquired of you whether or not you received a subpoena and whether or not you received the rights on the subpoena, including the



0001147

right to have a lawyer present and the right not to incriminate yourself. You told me that you had reviewed the subpoena and you understood those rights; is that correct?

OFFICER MIX: Yes.

MR. DONALDSON: And you told me that you would be willing to provide me with truthful testimony under oath as to what, if anything, you know about the homicide of Eric Williams; is that correct?

OFFICER MIX: Yes.

MR. DONALDSON: Would you raise your right hand, please. Do you solemnly swear or affirm that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

OFFICER MIX: Yes.

L I S A   M I X

was thereupon called as a witness herein, and after having been first duly sworn, was examined and testified as follows:

E X A M I N A T I O N

BY MR. DONALDSON:

Q Could you state your name and occupation please.

A Lisa Mix, police officer for the Detroit Police Department.

Q And how long have you been a police officer?



000148

A Five years.
Q And what is your present duty assignment?
A 1st Precinct patrol.
Q And do you presently have a regular partner?
A Yes, I do.
Q Who would that be?
A Tyrine Wheatley.
Q And were you and officer Wheatley working the evening of the 14th of April when you responded to an incident that happened at the Detroit Bar?
A Yes.
Q And were you in uniform that day?
A Yes.
Q And were you in a scout car equipped with video equipment?
A Yes.
Q And have you reviewed a video that captured a shooting that happened at that particular location?
A Yes.
Q Does that video fairly and accurately depict the events that occurred out there?
A Yes.
Q Were you driving the vehicle, or was your partner?
A My partner.
Q And what caused you to go to that location?



000149

A We received a police run from dispatch stating that there was a disorderly person at that location in the street with his pants down.
Q All right.
When you received that run, had you ever received a run like that to a location near there?
A Yes.
Q When you received that run, did you have any idea what you would encounter once you got there?
A Yes.
Q What did you expect and why?
A Well, pretty much we expected that it was Mr. Williams because I had previous incidents where he was in the street with his pants down.
Q All right.
Where were you when you got the run?
A We were at Gratiot and Beaubien.
Q So you were within two or three short blocks of where this incident occurred?
A Yes.
Q Did you drive directly to where the run was?
A Yes.
Q Upon arrival there what was going on, and what did you observe?
A Once we pulled up, we were coming up Fort where the

Detroiter Bar was. We observed a black male in the street with his pants down.

When we began to come to a slow stop, we were turning going westbound on Fort. The Michigan State Police showed up at the same time coming eastbound on Fort.

Q And when you say you saw Mr. Williams, was that the person you expected to see because of your earlier runs?

A Yes.

Q You didn't have any trouble recognizing him as that individual when you pulled up?

A No.

Q How as he attired? How was he dressed at that point?

A From what I remember --

Q Let me ask it a different way. I don't care about articles of clothing in particular. I'm asking how they were situated?

A Well, he had his coat and stuff on. His pants were at his knees at first, but when he started walking, they fell down to his ankles.

Q All right.

And was Mr. Williams facing in your direction or facing in some other direction?

A He was facing in another direction going westbound. We was facing westbound.
Q And where was that in relationship to where the State Police car was?
A The State Police car was facing eastbound. They were facing straight towards Mr. Williams.
Q So he would have been facing the scout car with his back towards you, if I have it correct?
A Yes.
Q When you approached and you made that observation of him with his pants situated that way, I think you've already indicated, but if not, did Mr. Williams move at all?
A Yes, he started to walk.
Q In what direction?
A He started going westbound on Fort.
Q And where is that in relationship to where the troopers were?
A They were facing him going eastbound. He was walking straight towards the vehicle.
Q Could you hear what was going on when you came out?
A No.
Q Could you hear Mr. Williams saying anything?
A No.
Q Could you hear the officer saying anything?:



CCCTCC

A No.
Q What happened as you saw him walking towards the trooper's vehicle?
A Once he started walking towards the trooper's vehicle, when we came close enough to it, the officer exited the vehicle along with his partner.
Q All right.
And then what happened?
A The officer drew his weapon, aimed it, and shot Mr. Williams.
Q Were there two troopers in that vehicle?
A Yes.
Q Describe them.
A The passenger was a white female with black hair. I would say approximately 5'5". I would say about 170 pounds. The driver, I would say about 6'2", 6'3", approximately 180 to 200 pounds, white male, tall.
Q Had you ever seen either of those officers before that day?
A Only the driver.
Q And the driver was the male or the female?
A Male.
Q And who exited the vehicle and aimed and shot?
A The driver did, the male.
Q Do you know where Mr. Williams was situated when the

shot was fired?

A He was standing right by the driver's door near the hood of the car.

Q All right.

If I am understanding you correctly, and you correct me if I'm wrong, you're saying that he was walking and he was even with the hood of the car, or are you saying something else?

A I'm not understanding you.

Q Sometimes I ask bad questions.

You're were talking about the hood of the car, and you were talking about Mr. Williams approaching the scout car. Was he even with the hood of the car when the shot was fired, or are you saying something different?

A No, I don't believe I'm saying something different because as he started walking, like I say, he was stumbling. He came near the door -- between the door and the hood of the car, right when you open the door.

Q Correct.

A That's the part he had approached when the officer exited the vehicle.

Q And that's when the shot was fired?

A Yes. Once he exited the vehicle first, then he drew

001103

his weapon. He was holding his hand for it, but he drew out his weapon and he shot (indicating).
Q You extended your left arm forward and had your arm out and gestured with your right hand just now. Do I have that right?
A Yes. From that I can remember he extended his left hand out, drew out the weapon. He pointed it. He shot.
Q Mr. Williams -- did you see anything in Mr. Williams' hand at any point in time when you were there?
A No.
Q Did you ever see him strike at or attempt to make contact with the trooper?
A No.
Q After the shot, what happened?
A After the shot Mr. Williams went limp and fell over the hood of the car. The officer went around, help him up, and I guess was patting him down to check for a weapon. Once I got over there -- he said he was shot.
My partner called dispatch and asked them to send EMS. It was a priority. He asked them to send EMS. Man down.
Then when we approached over there where the

officer was, I asked him where was he shot at. We got him down on the ground. He pulled his shirt back, and he had a wound to the left side of his chest.

Q Did the trooper that shot Mr. Williams speak any words at the scene that you heard?

A Yes.

Q What, if any, words did you hear him speak?

A He said, "Please don't die."

Q Did you hear him speak any other words?

A No. He said that repeatedly.

Q Did you have any discussions with that trooper about the circumstances of the shooting, or what led him to do the shooting?

A Well, in the beginning I went over there and I asked him, you know, basically when we got him down and made sure he had a pulse, and made sure he was still breathing, I asked him what happened. He said he thought he had something or was digging in his pockets or something. I don't know. As far as that, he didn't discuss nothing no further.

MR. DONALDSON: I don't have any other questions. I don't know if the officer has any.

OFFICER WICKER: May I ask one?

MR. DONALDSON: Yes.



000150

OFFICER WICKER: When you indicated the officer was with his left hand out, in your opinion was that him telling the man to stop, or you just saw a hand out, and you don't know what that was?

THE WITNESS: Well, from him having his hand out like that, you know, if I'm pretty much trying to guess at it, it was for stay back, but I didn't hear any verbal answers.

OFFICE WICKER: Thank you.

MR. DONALDSON: I don't have any further questions to ask you. I would indicate that it is my practice at this point in time to remind you that your testimony has been under oath and ask you if there is anything that you would like to change about what you told us or anything that came out wrong?

THE WITNESS: No.

MR. DONALDSON: We can close the record.

(Proceedings concluded at 2:33 p.m.)

CERTIFICATE

STATE OF MICHIGAN)
 ) ss.
COUNTY OF WAYNE )

I, Lorraine H. Nagy, hereby certify that I reported the foregoing proceedings at the time and place hereinbefore set forth; that the same was later reduced to typewritten form; and that the foregoing is a true, full and correct transcript of said proceedings.

Lorraine H. Nagy, CSMR 6060
Court Reporter

Date: April 28, 2005