STATE OF MICHIGAN
IN THE 36TH DISTRICT COURT FOR THE CITY OF DETROIT
CRIMINAL DIVISION

PEOPLE OF THE STATE OF MICHIGAN,

vs.

JAY MORNINGSTAR,

Defendant./

36th District Court
Case No. 05-59773

PRELIMINARY EXAMINATION

BEFORE THE HONORABLE JOSEPH N. BALTIMORE
36TH DISTRICT COURT JUDGE
Detroit, MI - June 21, 2005

APPEARANCES:

For the People:

JAMES GONZALES P36359
Assistant Prosecuting Attorney

JOHN FENNESSEY P41787
Assistant Prosecuting Attorney

ROBERT J. DONALDSON P36494
Assistant Prosecuting Attorney

For the Defendant:

RICHARD CONVERTINO, ESQ. P62829
211 W. Fort St. Ste 2001
Detroit, MI 48226
(313) 226-9629

LENORE M. FERBER, ESQ. P24223
302 N. Huron St.
Ypsilanti, MI 48917
(734) 487-4970

Reported by:

Sherrayna White Moore, CSR-6485
Certified Shorthand Reporter
(313) 965-6571

TABLE OF CONTENTS


| WITNESSES: | PAGE |
|---|---|
| TYRINE WHEATLEY | |
| Direct examination by Mr. Gonzales | 10 |
| Voir Dire examination by Mr. Convertino | 33 |
| Cross-examination by Mr. Convertino | 54 |
| MELISSA PASQUALE | |
| Direct examination by Mr. Donaldson | 85 |
| Voir Dire examination by Mr. Convertino | 86 |
| Cross-examination by Mr. Convertino | 96 |

EXHIBITS

(None marked.)

Detroit, Michigan

Tuesday, June 21, 2005

about 2:06 p.m.

--- --- ---

THE COURT: People of the State of Michigan versus Jay Morningstar; Case 05-59773. Counsels, your name for the record.

MR. GONZALES: James Gonzales appearing on behalf of the People.

MR. DONALDSON: Robert Donaldson for the People, your Honor.

MR. FENNESSEY: John Fennessey for the People.

MR. CONVERTINO: Rick Convertino on behalf of Jay Morningstar.

MS. FERBER: Lenore Ferber for Jay Morningstar.

THE COURT: Count one indicates homicide murder second degree; count two, homicide manslaughter death by weapon aid with intent but without malice. Are those the charges?

MR. GONZALES: That's correct. That's my understanding.

MR. CONVERTINO: Yes, Judge.

THE COURT: All right. Let's proceed.

MR. GONZALES: Your Honor, a couple of preliminary matters I'd like to place on the record at the outset. It's my understanding having spoken with Counsel that there would be a stipulation in this matter with respect to the identification of the deceased in this matter. I'd like to place that on the record at this time if your Honor please.

THE COURT: Very well.

MR. GONZALES: Your Honor, it's my understanding that defense counsel would stipulate where Janice Williams would testify she had occasion on the date of April 14, 2005 to go to the office of the Wayne County Medical Examiner and on that date she had occasion to view the remains on morgue Case File Number 05-0370. She had occasion to identify those remains as being Eric Williams.

She identified that Mr. Williams was in fact known to her by relationship and that in fact she was Mr. Williams' aunt and he was her nephew. That would be the sum and substance of the stipulation with respect to the testimony of

Janice Williams.

MR. CONVERTINO: Yes, sir. Thank you, Judge. We have no objection to that stipulation.

THE COURT: Very well. Let the record reflect there's no objection.

MR. GONZALĖS: Your Honor, the People would make a motion to sequester, and make it on behalf of both sides, a mutual order of sequestration. I would indicate for the record we have present in the courtroom three officers who we would submit to the Court as being officers in charge of the case. We have Sergeant Ed Price from the Michigan State Police. We have Sergeant Glen Davis in the Detroit Police Department and Detective Casandra Brown, investigator from the Prosecutor's Office. I'd ask that they be exempted from the sequestration. Any and all other witnesses with the exception of those individuals be sequestered who may testify either now or at trial later.

THE COURT: Satisfied with those three?

MR. CONVERTINO: Yes. We have no

objection to that sequestration.

THE COURT: Very well. Granted.

MR. GONZALES: With that, your Honor, the People would call Police Officer Tyrine Wheatley.

THE COURT: You have to help me with the witness. Are there any other witnesses you think the sequestration order would be applicable to, because I have no idea?

MR. CONVERTINO: I'm assuming that witnesses that were sent over, discovery witnesses who will testify in future proceedings as well as proceedings today, that the sequestration order applies to all witnesses and potential witnesses that the prosecutor will call.

MR. GONZALES: It's my understanding as well. I've checked the court, your Honor. Other than the names that were mentioned previously, there are no other witnesses on behalf of the People, and I assume the same for the defense.

One other housekeeping matter, your Honor. As a portion of some of the testimony in this case I anticipate we may be showing a

video. I would ask that the Court, for housekeeping arrangements, where your Honor would like us to set up the facilities. We can do that at this time.

THE COURT: I suppose both of you will want, along with myself, want a good viewing angle.

MR. GONZALES: I would suggest perhaps by your Honor's court officer if there's plugs there. That would be appropriate for both the defense and us.

THE COURT: You might as well bring it on over and set it up right now. So then we won't have to stop.

Would you be so kind to identify the persons that you wanted excluded. The witnesses are?

MR. GONZALES: This is the first witness who just entered the courtroom; Officer Wheatley. Did you need--this is Ed Price, Michigan State Police; and then Detective Cassandra Brown, our investigator from the Prosecutor's Office.

THE COURT: Okay. What about the other officers?

MR. GONZALES: I have no idea who they are. They're not people that I would be calling. They're probably here on behalf of the defense.

MR. CONVERTINO: I'm not sure, Judge, who those officers are myself.

THE COURT: All right. They're perfectly welcome to stay. I don't know if they were here when the sequestration order was granted and I don't know whether or not--I was going to tell them that there has been an order entered then so they would have to step outside. If they're not witnesses, I don't-

MR. CONVERTINO: I don't believe they are. Can I ask him to state his name for the record and identify the officer.

LIEUTENANT HENDRICKS: Lieutenant Robert Hendricks, shift commander of Trooper Morningstar.

MR. GONZALES: If he had some relationship with the defendant I'd ask him to be sequestered.

THE COURT: We've entered a sequestration order, so you're going to have to step outside if you were not exempted by that

order.

MR. CONVERTINO: Judge, may I be heard briefly on that? Lieutenant Hendricks is not going to be a witness, I don't believe, in the prosecutor's case and certainly not in our case. Unless the Court sees a reason other than that to sequester the lieutenant-

THE COURT: I don't know. Mr. Prosecutor just indicated that he believed that there might be some connection. I don't know. Whatever. You two know your witnesses. I don't.

MR. GONZALES: I would ask him to be sequestered if he was the shift commander at the time of the incident. That makes him relevant to the case.

THE COURT: Just to be on the safe side. All right. Let us proceed.

MR. GONZALES: The People call Officer Wheatley.

THE COURT: Raise your right hand to be sworn. Do you solemnly swear or affirm that the testimony you will give will be the truth?

THE WITNESS: I do.

THE COURT: Please have a seat and

keep your voice up.

TYRINE WHEATLEY,

having been first duly sworn, was called as a witness at 2:06 p.m., and testified as follows:

DIRECT EXAMINATION

BY MR. GONZALES:

Q. Good afternoon, sir. Please give us your name.

A. Tyrine Wheatley.

Q. And how are you employed, Mr. Wheatley?

A. Police officer, city of Detroit.

Q. Were you so employed on the date of April 13th carrying over to the date of April 14, 2005?

A. Yes, I was.

Q. And how were you assigned on that date?

A. I was assigned to Scout 1.

Q. And what precinct is that assigned to?

A. 1st Precinct.

Q. On that date what was your general assignment?

A. Patrol officer.

Q. In the course of doing patrol officer on that assignment on that date did you have a partner?

A. Yes, I did.

Q. Who was your partner?

A. Lisa Mix.

Q. On that date how long had you been a Detroit police officer?
A. Seven years.
Q. And in that area in those seven years on that date you were routine patrol?
A. Yes.
Q. Okay. Did there come a time on that date in the course of being on routine patrol that you received a police run to the area of Beaubien and East Congress in the city of Detroit?
A. Yes, I did.
Q. And when you got that run what format did it come to you?
A. The run came over the radio as disturbance; a man in the middle of the street with no clothes on.
Q. Can you say that again. I didn't hear you.
A. The run came out as disturbance; man in the middle of the street with no clothes on.
Q. Okay. And is that the entirety of the radio run you received?
A. Yes.
Q. And based on that did you take any action?
A. I proceeded to the location.
Q. And you used a Detroit police vehicle?
A. Yes, we did.

Q. Were you the driver or the passenger?
A. I was the driver.
Q. And was Officer Mix, your partner, with you at that time?
A. Yes, she was.
Q. Was she the passenger?
A. Yes, she was.
Q. And approximately what time did you receive this radio run?
A. It was approximately--I can't give a definite time. I can refer you to my PCR for a definite, but it was approximately 1:30 a.m.
Q. Would that have been in the early morning hour just past midnight on April 14, 2005?
A. Yes.
Q. Immediately before receiving that radio run where had you been situated at?
A. I was at the 1st Precinct.
Q. And were you in your vehicle at the moment or no?
A. No.
Q. Did you have to go to your vehicle and enter your vehicle?
A. Yes.
Q. Where was your vehicle parked at?
A. It was parked in front of 500 Michigan, which is the

1st Precinct.
Q. And did your partner go with you to your parked vehicle?
A. Yes, she did.
Q. And did you then proceed to the area of Beaubien and East Congress?
A. Yes, I did.
Q. Did you go there in a direct manner?
A. Yes.
Q. When you got to that location, eventually given the nature of the radio run you received, did you see any individual that matched that description of that radio run?
A. Yes.
Q. Okay. When you first saw this individual where was this individual situated at?
A. He was standing in the middle of East Fort.
Q. East Fort, F-O-R-T?
A. Yes.
Q. Is that located in the city of Detroit?
A. Yes, it is.
Q. When you saw him standing in the middle of East Fort was there anything unusual about his clothing or his appearance that you could perceive when you first saw him; immediately at first?

A. His pants was down to his knees.
Q. And as a result of his pants being down to that area, were you able to see his bare legs?
A. Yes.
Q. Did he have clothing above?
A. Yes.
Q. When you first saw him where was he physically standing at?
A. He was physically standing in the middle of the street facing westbound.
Q. Now, when you say facing westbound is that on East Fort?
A. Yes.
Q. So he was facing west on East Fort; is that correct?
A. Yes.
Q. Which direction were you travelling as you approached the individual?
A. When I initially saw him I was travelling southbound on Beaubien.
Q. Okay. And does that intersect with East Fort Street?
A. Yes.
Q. And does it, if you will, travel south perpendicular to East Fort which crosses Beaubien?
A. Yes.
Q. And as you came to East Fort, when you saw this

individual, you said he was facing east what did you do with your vehicle as you approached that scene?
A. I turned my vehicle onto East Fort from southbound Beaubien. My vehicle was facing westbound on East Fort.
Q. Westbound on East Fort or were you also--were you facing the same direction as the individual?
A. Yes.
Q. Okay. So when you were facing in the same direction as the individual were you in front of him or behind?
A. I was in the rear of him.
Q. And were you able to see, other than the individual out there, any other police vehicle?
A. Yes.
Q. What did you see?
A. A trooper vehicle. Its overheads were activated.
Q. And when you say "trooper vehicle" was that a Detroit police vehicle?
A. No, a Michigan State Trooper vehicle.
Q. Eventually were you able to observe whether or not there was anybody in that Michigan State Police vehicle?
A. Yes.
Q. And can you describe who was in that vehicle that you could see?

A. He's sitting at defense counsel table with the gray suit on.

MR. GONZALES: For the record, your Honor, the witness pointed to the defendant in this matter, Jay Morningstar.

THE COURT: Very well.

BY MR. GONZALES:

Q. Officer Wheatley, when you observed Mr. Morningstar where was he at in the State Trooper vehicle?

A. He was sitting on the driver side of the vehicle.

Q. Now, as you approached the individual in the street, what if anything, did you do--strike that. When you approached that individual on the street what, if anything, did you see that individual do next?

A. I seen him approach the trooper's vehicle.

Q. How did he approach this trooper's vehicle?

A. He walked towards it.

Q. And at that time that he walked towards the trooper's vehicle were his pants still down?

A. Yes, it was.

Q. And, the trooper's vehicle, was it moving or stopped?

A. It was stationary.

Q. When you first saw the individual move towards the trooper's vehicle, and in relation to where the

trooper's vehicle was stopped at, how far apart were they?

A. I'd say about ten to fifteen feet away.

Q. Did you see the individual that was in the middle of the street with his pants down walk in the direction of the police vehicle?

A. Yes, I did.

Q. What did you see happen next, Officer?

A. He continued to approach the trooper's vehicle, and the trooper got out of the vehicle and walked around the vehicle's door and fired one shot.

Q. And is that the individual you've identified in court who did that?

A. Yes.

Q. And as a result of him firing that one shot did you see the individual with his pants down; anything happen to him?

A. He slumped over.

Q. And, when you say slumped over, what direction or where did he land?

A. He went forward towards the trooper and almost landed on the trooper's vehicle's hood.

Q. When you made these observations that you just described, were you inside your vehicle or outside your vehicle?

A. Initially I was inside.
Q. Okay. Did there come a time you came out?
A. Yes.
Q. When you got out of the vehicle did you go in the general direction of the individual in the street; in other words, did you walk that way?
A. I walked in that direction, yes.
Q. And were you outside the car when you made the observations that Mr. Morningstar shot and fired his weapon?
A. Yes.
Q. So you weren't inside your car; you were outside of it?
A. Yes.
Q. You were on foot?
A. Yes.
Q. In the course of your making this observation, before the shots were fired, Officer Wheatley, at any time did you hear Mr. Morningstar-

MR. CONVERTINO: Objection, leading, Judge.

MR. GONZALES: I didn't finish the question, but I'm asking him if he heard him say anything.

THE COURT: I'll allow it.

BY MR. GONZALES:

Q. I'll repeat the question for you, Officer. At any point in time as you are in your vehicle get out of your vehicle or as you approached the scene and observed the shots being fired do you hear Officer Morningstar say anything?

A. No.

Q. Do you hear the individual with his pants down say anything?

A. No.

Q. How much, in terms of time, did it take for you to observe the individual walk in the direction of where Mr. Morningstar was and then Mr. Morningstar shoot and fire?

A. It was approximately thirty, forty seconds later.

MR. CONVERTINO: Judge, I'm going to ask that he repeat that question and answer. I didn't quite get the question.

MR. GONZALES: Is he asking the court reporter or me?

THE COURT: Do you want it read back to you?

MR. CONVERTINO: I just want the question and answer, yes, sir. The last question and answer, please.

THE COURT: Did you want him to answer or you want the answer read back to you?

MR. CONVERTINO: Whatever is most convenient for the Court, but I thought he said from the time he first saw-

MR. GONZALES: I have no objection to her reading it back.

MR. CONVERTINO: -it was thirty or forty seconds until he got to the police car.

THE COURT: Read it back.

(The last question and answer was read back by the reporter.)

MR. CONVERTINO: Thank you very much, Judge. Thank you.

BY MR. GONZALES:

Q. Now, you said the individual that was shot went on to the hood area of the vehicle; is that correct?

A. Yes.

Q. Did you see Mr. Morningstar at that point in time do anything with respect to that person?

A. Yes.

Q. What did he do?

A. It appeared to me that he was patting him down for weapons.

Q. And in what manner; can you be more specific?

A. As far as like placing his hands in his chest area, back area, as if he was patting him down searching for a weapon.
Q. Chest area and back area?
A. Yes.
Q. Now, eventually that individual with his pants down, was he removed from the hood of the car or taken from that area?
A. Yes, he was.
Q. What did you see?
A. Trooper Morningstar assisted him down to the ground.
Q. Was his weapon out at that time; Trooper Morningstar?
A. I don't believe so.
Q. When you last saw Trooper Morningstar's weapon, did you ever see him holster it?
A. I can't recall. I can't recall definitely.
Q. Now, how many shots then did you see fired or hear fired?
A. I heard only one shot fired.
Q. No other shots that you're aware of?
A. No.
Q. Now, when you exit your vehicle at any point in time did you draw your weapon?
A. No.
Q. To your knowledge, at any point in time did your

partner exit your vehicle?
A. Yes, she did.
Q. At any point in time did you, to your knowledge, did your partner, Officer Mix, ever draw her weapon?
A. At that time I didn't, no.
Q. Okay. Did you ever see her with a weapon out?
A. I didn't. Never observed it, no.
Q. Now, the man in the middle of the street, when you first observed him before he began to move, you indicated his pants were down; is that correct?
A. Correct.
Q. At that point in time when you observed him did you see that individual with any weapon?
A. I didn't focus on his hands, no.
Q. I didn't ask you that question. Did you see him with any weapon?
A. No, I didn't, no.
Q. In the course of this entire incident did you see him with any weapon?
A. No.
Q. In the course of the pat down you were talking about with respect to Mr. Morningstar did you ever see any weapon recovered from that individual?
A. No.
Q. Did you see any weapon recovered in the area?

A. No.
Q. Now, all these events occurred in the city of Detroit; is that correct?
A. Correct.
Q. Now, eventually after this incident do you have any other contact with the individual that is shot?
A. Do I have any contact, no.
Q. That night do you go up to him at all; do you do anything with the body?
A. I did walk up and observed.
Q. Did you see whether or not he was injured?
A. Yes.
Q. What did you see?
A. I seen a gunshot wound to his chest area.
Q. How many wounds?
A. Just one.
Q. Now, did you transport him to the hospital or anything of that nature?
A. No, I didn't.
Q. Did you call for any help?
A. Yes, I did.
Q. What did you do?
A. I called via radio to our dispatcher for EMS.
Q. Was that based on your observation of his condition?
A. Yes.

Q. Eventually after that did you go anywhere?
A. No.
Q. Eventually did you go to the hospital?
A. Oh, yes, eventually later on in the morning.
Q. Approximately what time did you go to the hospital?
A. It was approximately 5:00, 5:30 in the morning.
Q. Which hospital did you go to?
A. Detroit Receiving Hospital.
Q. Okay. At that point in time why did you go there?
A. To get his chart number, doctor and condition of Mr. Williams.
Q. And the individual that you had seen shot, which hospital was he transported to?
A. Detroit Receiving.
Q. Is that the hospital you went to?
A. Yes.
Q. Did you get that information; chart number, doctor and condition?
A. Yes.
Q. What was his condition?
A. He was deceased.
Q. Did you speak with anyone at the hospital?
A. The triage nurse.
Q. Other than the triage nurse did you speak with anyone else?

A. No.
Q. Did you speak with a doctor at the hospital?
A. No.
Q. Did you retrieve any evidence from the hospital?
A. No.
Q. Now, I'd like to take you back to the initial observations you made first of the individual on the street with his pants down. That individual, you indicated he walked in the direction towards where Mr. Morningstar was?
A. Correct.
Q. And how would you describe his walk?
A. It was a steady pace.
Q. And were his pants down throughout the course of that walk?
A. Yes.
Q. Did you see any difficulty or any problem in his walk as a result of his pants being down?
A. It was basically--I really didn't focus in too hard on his walk. I just observed him walk towards the trooper's vehicle.
Q. And you characterize it as what kind of pace?
A. A steady pace.
Q. Okay. And how far a distance would you say it was before you heard the shot?

A. My position?
Q. No, the individual. When you first saw him to the point in time when you heard the shot.
A. The point in time I heard the shot he was approximately three feet from the trooper.
Q. Okay. And how far had he traveled from when you first seen him to that point in terms of feet?
A. Approximately ten feet.
Q. So when you first saw him you went in a steady pace toward where?
MR. CONVERTINO: He's repeating questions, Judge.
MR. GONZALES: I'll rephrase it.
THE COURT: Rephrase it.
BY MR. GONZALES:
Q. When you say ten feet what do you mean? What distance is that?
A. Say that again. Repeat the question. I didn't understand.
Q. What distance was that?
MR. CONVERTINO: Objection. What distance is ten feet? Ten feet is ten feet.
MR. GONZALES: I'm talking about from where to where.
THE COURT: Rephrase the question.

BY MR. GONZALES:

Q. When you just gave us a distance from where to where what were you referring to?

A. Ten feet meaning the point of travel toward the trooper.

Q. And, when you say toward the trooper, can you be more specific; from where to where?

A. The distance traveled from the initial point of my observation to the point of the shot being fired.

Q. And that was how far?

A. Approximately ten feet.

Q. Now, your vehicle, what kind of vehicle was it?

A. It was a fully marked Detroit police scout car.

Q. And as a result of being a fully marked Detroit police scout car, did it have any video equipment?

A. Yes, it did.

Q. What kind of video equipment?

A. It's a digital camera.

Q. Where is it located; the digital camera?

A. It's in the middle of the windshield.

Q. Okay. And is it facing out from the middle of the windshield?

A. Yes, it is.

Q. And prior to any of these events happening that day, did you have occasion to do any action with respect

to that shot when you first got on shift?
A. At the beginning of each shift we check our video equipment to insure that it's working properly.
Q. Did you have occasion to do that on this shift?
A. Yes, I did.
Q. From April 13th carrying over to April 14th?
A. Yes, I did.
Q. Approximately-
A. At the beginning of the shift, yes.
Q. Approximately what time was that?
A. It's approximately 10 after 11.
Q. That's in the evening?
A. Yes.
Q. Okay. And at that time physically what did you do?
A. Physically just click onto our inside viewer and click it on and it shows that it's recording.
Q. Okay. And you monitor whether or not it's recording yourself?
A. Yes.
Q. And did you do that on the evening of the 13th?
A. Yes.
Q. Was it recording properly?
A. Yes.
Q. Eventually, as a result of your observations in the area of East Fort and Beaubien in the city of

Detroit did you have occasion to go back and check your video?
A. Yes.
Q. And eventually after your shift did you take any action with respect to your computer digital camera?
A. Yes.
Q. What do you do?
A. Basically log out.
Q. And when you say you log out what do you log out of?
A. Of the inside viewer. We ended tape recording.
Q. Did you do that on this occasion?
A. Yes.
Q. Did there come a time then that you had occasion to, after you logged out and checked your camera, that anything was recorded with respect to the incident that occurred at approximately 12:30 in the area of East Fort and Congress; did the video capture it?
A. Yes.
Q. Did you see it with your own eyes?
A. Yes.
Q. And based on what you've seen of that video, did it fairly and accurately depict what you saw with your own eyes?
A. Yes.
Q. Now, your camera, does it have the ability to capture

both sound and video?
A. Yes.
Q. Okay. Now, was there sound attached to the video that you recorded?
A. No.
Q. Why was that?
A. We didn't turn it on.
Q. And, when you say you didn't turn it on, you hadn't turned it on prior to these incidents occurring?
A. Correct.
Q. So, in other words, your sound monitor was off at the moment of occurrence?
A. Correct.
Q. So when you eventually viewed what your camera recorded, was there any sound recording?
A. No.
Q. Now, does your camera eventually have--strike that. Does your camera have an actual camera number?
A. Yes, it does.
MR. GONZALES: I'd like to have something marked, your Honor, and approach the witness.
BY MR. GONZALES:
Q. Officer Wheatley, one question. What is your scout car code or camera code, if you recall it?

A. I don't recall.
Q. Would that be in your report?
A. It would be on our run sheets for the evening.
Q. Would that refresh your recollection if I hand that to you?
A. Yes, it would.
MR. GONZALES: May I approach the witness, your Honor?
THE COURT: Yes.
BY MR. GONZALES:
Q. Officer Wheatley, I'm handing you what purports to be your run sheet. I'll ask if that will refresh your memory.
A. Yes. We were in Vehicle Code 043001 and our camera number was-
Q. That's all I need. 043001; correct?
A. Yes.
Q. Handing you what's been marked and shown to Counsel as People's Proposed Exhibit Number 1 and ask if you can identify the camera code number on that?
A. Yes.
Q. What is it?
A. 043001.
Q. Is that the same camera code that you have?
A. That's correct.

MR. GONZALES: Your Honor, I'm going to ask my assistant to put it on the monitor and ask the officer to observe it and ask him to identify it. And I would state on the record that prior to the preliminary exam occurring this morning we had the opportunity briefly to show this individual CD rom to the defense team and this is the same disc that we've marked and just had the officer identify.

MR. CONVERTINO: Judge I'd like to voir dire the witness if we're going to show this.

THE COURT: Sure. Proceed.

MR. CONVERTINO: Thank you, Judge.

MR. GONZALES: Well, your Honor, my objection would be I haven't even finished my foundation yet, so how can he begin his voir dire when I haven't finished my foundation?

THE COURT: All right. Before we play it you'll have an opportunity.

MR. CONVERTINO: Thank you, Judge.

THE COURT: I suppose he wants to voir dire on how this information was taken.

MR. GONZALES: I have no objection to voir dire. My only foundational question is

going to be if he could look at it and if he could identify it, then I would move to admit it and turn it over to any voir dire and he can object at that time.

THE COURT: Let him voir dire as to how this particular exhibit came into his possession.

MR. GONZALES: It's not in his possession. This is a copy of the video. He has to see it to identify it as being what he saw that night.

THE COURT: Let us see what his voir dire is, and if it falls over into cross-examination then we will cut it off.

MR. GONZALES: Thank you, your Honor.

THE COURT: Proceed.

MR. CONVERTINO: Thank you.

VOIR DIRE EXAMINATION

BY MR. CONVERTINO:

Q. Good afternoon, sir. I'm going to ask you specifically about the video and the camera in your car. And if you'll tell us, please, how the information gets from your car to this disc, and

first I want to ask you about the operation of the camera that night. You said it was in good working order?
A. Yes.
Q. And you said that based upon your review of the activity log that you filled out-
A. Say that again.
Q. You filled out an activity log?
A. Yes.
Q. And the activity log goes through the events that occurred on your shift; is that right?
A. Correct.
Q. And, among the things that occurred on your shift, was the checking to see if your video worked; is that true?
A. Correct.
Q. And also, when you checked to see if the video worked, you checked to see if the microphone worked; is that right?
A. This evening we didn't see if the microphone worked.
Q. You have the activity log in front of you, sir?
A. Yes, I do.
Q. Does it say on the activity log tell us the date of the activity log?
A. The day was April 14, 2005.

Q. And on April 14, 2005 before you began your shift you take one of those logs in blank form and fill out everything that occurs on your shift?

MR. GONZALES: I'm going to object, Judge. I'm going to object. Are you admitting the activity log or the video? I think the activity log is the focus of Counsel's questioning. I think we're here to voir dire on the video. I submit it's irrelevant to that foundation.

MR. CONVERTINO: The specific questions I want to ask him are about the camera.

THE COURT: I'll allow it.

BY MR. CONVERTINO:

Q. Regarding the video log, sir, certain things you do and everything you do; is that fair to say, that of any importance on your shift should be in that log; is that right?

MR. GONZALES: He's characterized the video log. This is an activity log run sheet as the officer calls it. If he's referring to something else, I'm missing it.

THE COURT: All right.

MR. CONVERTINO: Thank you.

BY MR. CONVERTINO:

Q. Is that true what I just said; all of your activities for that night are included in that log; is that right?

A. For the most part, yeah.

Q. What's not in there?

MR. GONZALES: Your Honor, objection to relevancy as to foundation for the video.

THE COURT: I'll allow the question.

BY MR. CONVERTINO:

Q. What events occurred on that night, in particular, the night you filled out that log that are not in there?

MR. GONZALES: Judge, I don't see how that's relevant; events that occurred that day to the video. If it's related to the video I'll sit down.

MR. CONVERTINO: It may be. I don't know. That's why I ask the question.

THE COURT: I see his point. The voir dire is going to be limited as to what occurred specifically as to how this video was taken and to show that it accurately reflects what he's talking about. Let's sort of limit that to just for the voir dire. You might want

to explore that during the cross-examination. I don't know.

MR. CONVERTINO: Thank you, Judge.

BY MR. CONVERTINO:

Q. Sir, all of the events that took place regarding the video camera in your car are on that log; yes or no?

A. Correct.

Q. All of the events that took place regarding the microphone that's attached in purpose and plan to the video are on that log; is that right?

A. Right.

Q. Okay. And if you'll direct your attention to the portion of the activity log that you filled out, and you signed it, didn't you, sir?

A. I signed it, yes.

Q. It says on there that you tested the microphones as well as the video camera; is that true, sir?

A. No.

Q. Okay.

MR. CONVERTINO: May I approach the witness, Judge?

THE COURT: Yes.

BY MR. CONVERTINO:

Q. Referring to--I'm directing your attention, sir, to the line where you're leaving the station. You do a

camera check. Do you see that; equipment check?
A. Correct.
Q. Camera, right?
A. Yes.
Q. And its got the number of the camera?
A. Yes.
Q. It says upload complete; does it not?
A. Correct.
Q. Below it says MIC number one and two, and it has the number and it says mounted. Is that something other than the microphone, sir?
A. No.
Q. That's the microphone?
A. The microphones are mounted.
Q. Thank you, sir.
A. Thank you.
Q. And as a part of the check of the equipment that included, according to your log, the check of the microphone; is that right?
A. No, it isn't.
Q. So I misread that when I saw that equipment check and you put in there microphones mounted; you didn't check the microphones?
A. This states that the microphones are mounted inside the car; inside of the vehicle. There's mounts for

the microphone. It doesn't say we checked them.
Q. Were the microphones also affixed to your belts?
A. No, it wasn't.
Q. Just the mounts in the back of the car?
A. Yes.
Q. There's a directive that you're to obey as DPD, Detroit officer, regarding video in-car cameras and in-car microphones; is that right, sir?
A. Not that I have knowledge of, no.
Q. You're not familiar with any directive that instructs officers on how to handle the in-car camera and the in-car microphones on a run?
A. No.
Q. Have you ever had any training in the in-car cameras and how to download, upload and acquire information on the camera?
A. No official training. We didn't have--we had roll call training.
Q. Have you ever had any training, official training, sponsored by the Detroit Police Department or experts in how a microphone should be utilized in the car on your run?
A. No.
Q. Do you know if failure to disobey the directive of the Detroit Police Department is an offense that

could cause you some kind of internal punishment?

MR. GONZALES: Judge, objection to the relevancy.

THE COURT: Sustained.

BY MR. CONVERTINO:

Q. Let me draw your attention specifically, Officer Wheatley, to the in-car camera and the upload process that took place right before your shift as you noted in your activity log. Do you see that, sir?

A. Yes.

Q. What is meant by upload? Can you explain that?

A. That means the video isn't working properly.

Q. Upload is a test?

A. Yes.

Q. And how is it that you are aware when you get in the car that there's not any information in that video in that its already been reset?

A. I didn't understand your question.

Q. Okay. How is it information contained in the video is in the camera in your car?

A. It's loaded into like a master file. It's extracted from that file.

Q. Where is the master file?

A. I'm not certain.

Q. How is it extracted from the file?

A. I don't know.
Q. Who extracts this from the file?
A. I don't know.
Q. Not you, though, right?
A. Correct.
Q. Who loads it into the file?
A. Once the video is uploaded when we sign on at the beginning of the shift then they're loaded into the file.
Q. Okay. Then what happens at the end of your shift that you can give that information back to whoever it is that uploads or downloads or whatever they do?
A. Once we sign off the computer then at a later date and time wherever the master file is, it can be extracted.
Q. Do you know who does that?
A. No.
Q. How is it that at the end of your shift the information gets transferred from the camera into the computer?
A. I'm not for certain.
Q. Sir, have you seen this videotape?
A. Yes, I have.
Q. How many times?
A. Several times.

Q. How many would you estimate?
A. Ten times.
Q. When is the last time you saw it?
A. Yesterday.
Q. And you saw it in slow motion as well?
A. No.
Q. Just all the way straight through?
A. Yes.
Q. How many minutes are on the video total?
A. I'm not for certain.
Q. Approximately?
A. I don't know.
Q. You said that the video--you told the prosecutor that the video is a fair and accurate depiction of what you saw that night; is that true?
A. That's correct.
Q. You based that upon your memory and then a review of the video?
A. Correct.
Q. Can you tell us if the video is jerky your car didn't jerk that night, did it?
A. No.
Q. Your car was smoother in its operation?
A. Yes.
Q. Is that different from the video?

A. Yes.
Q. Is the video then unclear as to the actual true nature of the events as they unfolded that night?
A. There's a portion of the video where it gets fuzzy, yes.
Q. And that's not what happened that night; there was nothing fuzzy that night, was there?
A. No.
Q. And you recall in your review of the video, sir, that at various times the video gets flashed out so you can't see anything for maybe a half second, maybe more, because of the lights; is that true?
A. The video is effected, but you can see certain things but it's not a hundred percent clear, no.
Q. It's not a hundred percent clear and it's not clear like it was that night for you, is it?
A. Correct.
Q. So it's not a true and accurate depiction of the night in the events that occurred that night; is that true, sir?
A. No, it's true.
Q. In what sense; tell me?
MR. GONZALES: Now he's arguing with the witness. I think it's beyond the foundation.

THE COURT: I think it falls into a little bit more cross-examination.

MR. CONVERTINO: Thank you, Judge.

MR. GONZALES: Thank you, sir. I move for the admission of People's Exhibit Number 1.

MR. CONVERTINO: I object, Judge. I don't think it is a true and accurate depiction of the events that occurred that night. It's a--we have a segment of the eight-hour digital video shift that occurred. It's not clear. It's not smooth in its running. There--I believe that there are very serious flaws in the video, and this officer said it is not the same as he saw the events that night. So, for that reason, I would ask that the video be excluded.

MR. GONZALES: My response is he just got through saying it's a true production of what he saw with his own eyes.

THE COURT: I'll allow it.

MR. CONVERTINO: Thank you.

MR. GONZALES: I'll ask that your Honor get comfortable to be able to see the video.

THE COURT: Does it matter about the lighting?

MR. FENNESSEY: John Fennessey on behalf of the People. I don't think it matters about the lighting.

MR. GONZALES: I just want to ask Officer Wheatley one question before we start.

BY MR. GONZALES:

Q. On the video monitor you see a stationary shot; is that correct?

A. Correct.

Q. What is that depicting as the video begins first seen?

A. It's the front of the station, 1st Precinct.

THE COURT: Why don't we do this. You seem to be stretching. You may step down and as long as you're not blocking the view of counsels and myself.

MR. CONVERTINO: Judge, may I move up?

THE COURT: Sure.

BY MR. GONZALES:

Q. Now, you indicated this is your--what street?

A. Clinton Street.

Q. And that's where your vehicle was parked?

A. That's correct.
Q. Is that where your vehicle was parked when you received the radio run you refer to earlier?
A. Correct.
Q. And eventually your vehicle moves and you could see the direction you took to get to the area of East Fort and Beaubien in the city of Detroit; is that correct?
A. That's correct.
Q. And the direction you approach is southbound on Beaubien?
A. From Clinton Street?
Q. No, eventually the direction.
A. Eventually, yes.
MR. GONZALES: Your Honor, I'd ask that the video be run now.
(The video was run at 2:44 p.m.)
BY MR. GONZALES:
Q. Now, Officer you can resume your seat. You had an opportunity to view approximately ten minutes worth of video there for the record?
A. Correct.
Q. And is that a fair and accurate depiction of what you saw there with your own eyes?
A. It is.

Q. Now, I'm going to ask it to be rerun, and I'm going to ask you to step down, keep your voice up and kind of point to the street you're travelling and then eventually point out to where the individual is when you first see him that had his pants down. Can you do that for me, sir?
A. Yes.
Q. Please keep your voice up. Officer Wheatley, taking you back to the beginning of the video, where is your video camera filming at this time?
A. We're traveling eastbound on Clinton going through the alley northbound towards Gratiot.
Q. Keep your voice up as loud as you can. Which direction?
A. We're going northbound through the alley towards Gratiot. We're now travelling westbound on Gratiot.
Q. Are you pulling from the alley onto Gratiot?
A. From the alley onto Gratiot.
Q. What road are you on now?
A. Still on Gratiot.
Q. Which street are you coming to?
A. We're coming to Beaubien. We're going to be turning left southbound onto Beaubien from Gratiot. We're now turning southbound on Beaubien.
Q. What's that building on the left?

A. It's on his right side.
Q. So he removes his weapon; is that correct?
A. Correct.
Q. Is it a handgun?
A. Correct.
Q. And what does he do with it?
A. He raises it.
Q. And then does he point in any particular direction?
A. Yes, towards Mr. Williams.
Q. Okay. That's the individual that you saw with his pants down?
A. Correct.
Q. Okay. And then does--after aiming it does he then fire?
A. Correct.
Q. Does the video then show what happens to Mr.--well, the individual with his pants down next?
A. Yes.
Q. Go ahead. What happens to his legs?
A. They become limp.
Q. In what direction?
A. They go inward towards the vehicle.
Q. Go ahead.
A. He bends over at the waist and the trooper comes up.
Q. What does the trooper do with his hands?

A. The trooper is touching him in his upper body area.
Q. That's the person you identified as Mr. Morningstar; is that correct?
A. Right.
MR. GONZALES: Your Honor, no other questions with respect to the video. Let me check my notes to see if I have any other questions for Officer Wheatley.
BY MR. GONZALES:
Q. Now, these events occurred at approximately what time? And if you need to refer to your report, let me know.
A. Approximately 12:30.
Q. And did you eventually check to accurately put down in your report what time it occurred?
A. Yes.
Q. And how did you do that?
A. We went back into the video and put the times up and it showed the--it plays the time.
Q. You did that yourself personally?
A. Yes.
Q. What time did you come up with?
A. I can't recall the exact time at this point.
Q. Would your report refresh your memory?
A. Yes.

Q. Go ahead.

A. It's 12:30.

Q. That's at what time? What occurred at 12:30?

A. The shooting of Mr. Williams.

Q. Okay. Now, you continued to watch the video; is that correct, and it takes place over a period of moments; correct?

A. Correct.

Q. And for what we've watched in court the total length is how many minutes?

MR. CONVERTINO: Judge, these are leading questions. The last five or six have been that way.

THE COURT: I'll allow it.

MR. GONZALES: I'm asking him how many minutes worth of video we've watched.

THE COURT: I'll allow it.

THE WITNESS: I say approximately ten minutes.

BY MR. GONZALES:

Q. Now, throughout that time, and again, throughout any point in time you never saw the individual with his pants down with a weapon; correct?

A. Correct.

MR. GONZALES: Thank you. I have no

other questions.

THE COURT: Why don't we take a couple minutes and we'll do cross.

(The Court took a five-minute recess.)

MR. CONVERTINO: Judge, for the purposes of convenience, I'd like to begin cross-examination on the tape, if I may, sir.

THE COURT: Sure.

MR. CONVERTINO: Sir, would you rewind the tape to 12:39:04. May I begin, Judge?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. CONVERTINO:

Q. Officer Wheatley, this is the point in time that you said that you noticed Eric Williams when you first reviewed the tape today on your direct examination; is that right, sir?

A. That's right.

Q. Officer Wheatley, can you see from your vantage point?

A. Yes, I can.

Q. If you can't or you can't understand a question, will

you just let me know?
A. I sure will.
Q. Sir, at this point in time you are first encountering Eric Williams and on that night; is that right?
A. Approximately that time, yeah.
Q. Okay. Prior to getting up to the corner of Fort and Beaubien in your scout car, the camera is seeing exactly what you're seeing; is that true, sir?
A. Yeah.
Q. At this point in time, sir, you identified the person walking towards the trooper car as Eric Williams, right?
A. Correct.
Q. I want you to pay particular attention, sir, if you would, you cannot tell what, if anything, is in Eric Williams'; hand right there; is that true, sir?
A. By looking at the video or from my own independent recollection?
Q. You cannot?
A. Looking at the video, no.
MR. CONVERTINO: Will you advance that, sir. Continue. Stop.
BY MR. CONVERTINO:
Q. At that point in time, sir, looking at the same video about two steps later you cannot tell what, if

anything, is in the hands of Eric Williams as he approaches that Michigan State Trooper car, can you, sir?

A. At that point in time, no.

Q. Thank you, sir.

MR. CONVERTINO: Will you advance the tape, sir. Stop.

BY MR. CONVERTINO:

Q. Now, Officer Williams, this is at approximately-

MR. CONVERTINO: May I ask the time of the video, sir?

MR. FENNESSEY: Judge, at this time it says 1239078.

BY MR. CONVERTINO:

Q. So we progressed four since the first time you saw him to the time that he is now approximately--he being Eric Williams--at the front of the Michigan State scout car; is that right?

A. Correct.

Q. Can you tell us, sir, what is in--what, if anything based upon this, is in the hands of Eric Williams?

A. By the video you can't tell.

MR. CONVERTINO: Can you advance that, sir.

BY MR. CONVERTINO:

Q. Now, at this point in time, sir, this is after Trooper Morningstar had discharged his weapon.

MR. CONVERTINO: Can you stop that, please.

BY MR. CONVERTINO:

Q. You described what's happening now in the video as touching upon the upper body. Do you remember saying that in direct examination, sir?

A. Correct.

Q. Isn't in fact what's occurring is Trooper Morningstar is patting down or searching Eric Williams for weapons; is that true, sir?

A. I said previously that it appeared he was patting him down, yes.

Q. Patting him down for a weapon because he believed that Eric Williams had a weapon?

MR. GONZALES: I'll object to that. That's obviously speculation.

THE COURT: I'll sustain.

BY MR. CONVERTINO:

Q. When you pat down someone aren't you looking for a weapon?

MR. GONZALES: Your Honor, it's not something that this officer can say what's in someone else's mind.

THE COURT: All right. I'll sustain.

BY MR. CONVERTINO:

Q. Sir, earlier you testified that at the time I believe that you saw Eric Williams advancing to the police car, to the Michigan State Trooper car, was about thirty or forty seconds; is that right, sir?

A. Repeat that question for me, please.

Q. Earlier in your testimony on direct examination, and I asked our court reporter to read that back for us, I believe you said that the time that it took Eric Williams to advance from the first time you saw him until the Michigan State Police car was between thirty and forty seconds; did I hear that right, sir?

A. No.

Q. Can you tell me what you were talking about?

A. From the time that I observed Mr. Williams in the middle of the street and the time that he was shot was thirty to forty seconds.

Q. Okay. From the time you first observed Mr. Williams in the middle of the street, and you just told us that it was 12:39 and four seconds, that's what you said-

MR. GONZALES: I'm going to object to that, Judge. That's putting words in his

mouth. It was the tape that was read to Counsel. This witness never said anything.

THE COURT: I'll sustain the objection. Rephrase.

BY MR. CONVERTINO:

Q. At the time you said you first saw Eric Williams the tape reflected that it was 12:39 a.m. and 40 seconds; is that right?

MR. GONZALES: For the record, he doesn't know that, but I'll stipulate.

BY MR. CONVERTINO:

Q. You told us, sir, that the first time you saw Eric Williams that night when he stopped the tape; do you remember that?

MR. GONZALES: I object. He said approximately.

BY MR. CONVERTINO:

Q. Well, you tell us then, sir. We'll take the tape back to where you first saw Eric Williams that night in the street.

A. I can't take you to the exact point, because obviously there's an approximate. I can't tell you exact time I saw him. There is the approximate time I saw him.

Q. I understand about the approximate time. I mean, on

this tape when you first on direct examination said that's the first time I saw him that night, the prosecutor stopped the tape?

A. I never said direct time. I said approximately the time.

MR. CONVERTINO: Can you take us back on the tape, sir, to 04, please.

BY MR. CONVERTINO:

Q. Do you see that on the screen, sir?

A. Yes, I do.

MR. FENNESSEY: Your Honor, if I may, I don't know if Counsel wants to stipulate it's 12:39:03.

MR. CONVERTINO: 03.

THE COURT: All right.

BY MR. CONVERTINO:

Q. Is that the first time you saw Eric Williams on that night on the intersection of Fort and Beaubien?

A. Approximately, yes.

MR. CONVERTINO: And the time for the record, sir, is 12:30:03?

MR. FENNESSEY: Yes.

MR. CONVERTINO: Can you continue the tape, please, until I ask you to stop. Stop. Can you tell us the time on the tape,

please.

MR. FENNESSEY: Judge, it says 12:39:09. I don't know if he's going to stipulate to it.

THE COURT: No. Just say what the tape is.

BY MR. CONVERTINO:

Q. So approximately six seconds, based upon the review of the videotape, from the time that Eric Williams began to walk toward the Michigan State Police vehicle and until the time he stopped is about six seconds. Does that refresh your recollection, sir, as to the length of time it took Eric Williams to get to the State Trooper?

MR. GONZALES: I'm going to object to the form of the question. He never indicated any problem with his recollection. Counsel is trying to reflect something that's not accurate.

THE COURT: All right. Rephrase your question.

BY MR. CONVERTINO:

Q. Let me ask you this way, sir. If events take place on the video that contradict or differ in any way from your testimony, is it the video that should carry or your testimony?

MR. CONZALES: Objection, that's a question for this Court.

THE COURT: I think that's probably more of a question of credibility, because I am hearing what his testimony is and I am seeing or I am taking down what he said on the video. It will leave it to me to the weight I will give to each of these pieces of evidence.

MR. CONVERTINO: Thank you, Judge.

BY MR. CONVERTINO:

Q. You wouldn't disagree, would you, sir, that a difference between thirty and forty seconds for an officer to make a decision and the difference between six seconds before an officer makes his decision is a wide variance in time; is that true?

A. I agree.

Q. Officer Wheatley, I want to go back to the video in a moment. Before we leave, you have no way of testifying what Trooper Jay Morningstar saw when Eric--when he first saw Eric Williams; is that true?

A. That's correct.

Q. You have no way of testifying what Trooper Jay Morningstar felt about the threat that Eric Williams posed; is that true?

A. That's correct.

Q. You have no way of knowing exactly what Trooper Morningstar was seeing about the steady gate of Eric Williams and what he was viewing from Eric Williams when he made the decision, do you, sir?

A. Correct.

Q. It was a tense situation, wasn't it, sir?

MR. GONZALES: I'll object to that. There was no indication from anything this witness has said that this is a tense situation.

MR. CONVERTINO: He was there, Judge.

THE COURT: I suppose I will sustain the objection, because it asks this officer to make that kind of conclusion whether it was tense for the victim or tense for the defendant or tense for him. It's a little vague as to tense for who.

BY MR. CONVERTINO:

Q. Well, for you, sir. May I ask you was it a tense situation when you pulled up there and saw what you saw that night?

A. No.

Q. Was it uncertain in your mind?

A. Yes.

Q. Was it rapidly evolving in just a matter of seconds

in your mind?
A. Yes.
Q. Sir, you gave a deposition, if you will, you gave a sworn statement to the Prosecutor who's at the table today prior to your testimony here; is that right?
A. Right.
Q. I believe it was on the 19th of April. Do you recall that date?
A. Correct.
Q. Do you recall it was at 3 p.m.?
A. Right.
Q. And your partner, Lisa Mix, gave a statement as well; do you know that?
A. That's correct.
Q. And she gave a statement on the same day but just a few minutes before you; did you know that, sir?
A. Yes.
Q. Did you and Officer Mix talk about the testimony that you would give, either at the statement, on the record under oath or your testimony here today?
A. They would--did we give a deposition?
Q. No. Did you and Officer Mix talk about what you were going to say or what your testimony would be?
A. Not per se, no.
Q. Okay. Well, did you discuss what you were going to

say at the deposition?
A. No.
Q. Did she discuss what she was going to say?
A. No.
Q. Did you at any time compare notes prior to making and completing the police reports that you prepared?
A. Yes.
Q. How did that work, sir?
A. Verbally.
Q. What did you do?
A. We verbally talked to each other.
Q. Did you review her police report prior to her submission?
A. Yes.
Q. Did she review yours?
A. I'm not for certain.
Q. Did she make any changes to yours?
A. No.
Q. Did you make any changes to hers?
A. No.
Q. How many times prior to you making the police report did you view this video?
A. Maybe three to four times.
Q. Let me ask you, sir, about the police reports in the Detroit Police Department. Are there any

requirements or regulations for standard operating procedures about how an officer should prepare a report?
A. Yes.
Q. Are you familiar with those?
A. Yes.
Q. Can you tell us what those are? What is a directive? Is it SOP? What is it called?
A. General order and directives.
Q. General order. Do you know which general order it is?
A. Not for certain.
Q. Tell us when is the last time you reviewed that, sir?
A. I'm not for certain.
Q. And you said earlier you never reviewed a general order or directive regarding the in-car video; is that right?
A. No, that's not true.
Q. Can you tell us when you reviewed the general directive on the in-car camera video?
A. I said that I never reviewed the directive concerning in-car microphones.
Q. Oh, I see. Sir, are you aware that the directive on the in-car camera video also incorporates it in a segment on the in-car microphones? Are you aware of

that, sir?
A. No.
Q. The activity log, sir, that you completed, you check it at the end of your shift for accuracy?
A. Yes.
Q. Is it important that everything on there is accurate?
A. Yes.
Q. Why is that, sir?
A. Accountability.
Q. Accountability of what goes on that night?
A. Yes.
Q. You testified under oath in the deposition that you gave to the prosecutor here that at the time the call came in on April 18th in the early morning hour of April 18th that it was for a man in the street with-- man in the street, pants down?
MR. GONZALES: Your Honor-
MR. CONVERTINO: I'm sorry. I mis-spoke, Judge. I said the 14th. I meant to say the 18th.
BY MR. CONVERTINO:
Q. On the 18th the call came in as to what, sir?
A. It was as a disturbance.
Q. Disturbance, man in street with pants down?
A. Correct.

Q. How did that get communicated to you, sir?
A. Via the radio.
Q. And you were in the precinct at the time you heard that?
A. Correct.
Q. And then went into your car and told us what happened from there, right?
A. Correct.
Q. During the time you got into the--you received the call until the time you got to Fort and Beaubien, sir, you said that in your deposition that you knew it was Eric Williams; is that right, sir?
A. I said I had an idea it was probably him, yes.
Q. And you had an idea that it was Eric Williams because you had contact with Eric Williams several times in the past; is that right?
A. That's correct.
Q. And sir, when you got to the street you said, incidently when you gave that statement, you said you knew him by the name Eric Williams?
A. Correct.
Q. How many contacts had you had with Eric Williams prior to that time?
A. Several.
Q. Can you estimate?

A. Twenty.
Q. And sometimes you arrested him; is that right?
A. I never arrested him myself, but I've seen him arrested before, yes.
Q. And sometimes you took him to the hospital; isn't that true, sir?
A. That's correct.
Q. During any of those times was he violent?
MR. GONZALES: Your Honor, I'm going to object to this as specific instances that they're attempting to get into that that is irrelevant to what's in the video here.
MR. CONVERTINO: I believe it's very relevant, Judge, because at the time he went to the scene, if I may, now get into it if the Court allows, the time he went to the scene he took some actions based on what he said solely were in his mind about who the person was at the intersection and how the person--and the prior contacts he had with the person; that person being Eric Williams.
MR. GONZALES: I have no problem asking him questions regarding what actions he took, but how does that open the door to ask him about specific instances of conduct of the

deceased in this case?

THE COURT: I'll sustain the objection.

MR. GONZALES: Thank you.

BY MR. CONVERTINO:

Q. At the time you got to the intersection, sir, it took you, according to my review, and you correct me if I'm wrong, about more than fifteen seconds or so until after the shot took place until you got out of your police car; is that about right?

A. That's incorrect.

Q. Can you tell me how long it took you once your car arrived there; how long it was before you got out of the vehicle?

A. I got out of the vehicle right before the shot was fired, so it was, I say, approximately ten to fifteen seconds maybe. But I was out of the vehicle just about the time of the shot being fired.

Q. But you didn't go in front of the camera?

A. Correct.

Q. So, Officer Wheatley, when you got out of the vehicle, you opened the door, did you stay right there at the door?

A. Yes.

Q. Okay. Can you tell us then when it was approximately

when we're viewing this you got out of the vehicle?

A. I got out of the vehicle just as the shot was being fired; just prior to the shot being fired.

Q. During the time that Eric Williams was progressing from the intersection toward the police cruiser right up until the time the shot was fired you were in the vehicle; is that right?

A. The moment of time that he was approaching the trooper's vehicle I was still in motion. My vehicle wasn't completely stopped. I observed him walking towards the vehicle.

Q. It appears if--it appears that the vehicle is stopped. Is that because there's a glitch in the in-car camera video?

MR. GONZALES: Objection. That's speculation on two folds; one, that the video says that; and secondly-

THE COURT: I'll sustain the objection.

MR. GONZALES: Thank you.

BY MR. CONVERTINO:

Q. During the time, at least the time you were in the car and Eric Williams was walking towards Trooper Morningstar, for some period of time you were inside your car; is that right?

A. Correct.
Q. The windows were rolled up, sir?
A. Correct.
Q. At the time that the shot occurred, you said you heard that clearly; is that true?
A. Correct.
Q. You saw that clearly as well, sir?
A. Correct.
Q. Can you tell us--well, you mentioned on--testified on direct examination that the distance was about three feet; is that right?
A. Correct.
Q. Three feet from Trooper Morningstar to Eric Williams; is that right?
A. Correct.
Q. And that is from body to body; three-foot distance from body to body?
A. Approximately, yes.
Q. That's close range, isn't it, sir?
A. Yes.
Q. Can you tell us, sir, during the time that you first saw Eric Williams did you recognize him as Eric Williams?
A. Yes.
Q. Did you consider the situation dangerous?

A. No.
Q. So, you didn't consider the situation dangerous when Eric Williams was walking toward Trooper Morningstar; is that what you're saying?
A. Correct.
Q. That's because you knew Eric Williams; is that right?
A. Correct.
Q. That's because you had past dealings with Eric Williams; isn't that true?
A. Correct.
Q. Trooper Morningstar didn't know Eric Williams, did he?
A. I don't know.
Q. The contacts, the prior--what Eric Williams was doing prior to the contact on the arrival of both the Michigan State cruiser and your scout car, are you aware, sir, that Eric Williams was inside the Detroiter Bar?

MR. GONZALES: I'm going to object, Judge. Well, I'll withdraw that.

BY MR. CONVERTINO:
Q. Are you aware, sir, that Eric Williams was inside the Detroiter Bar?

MR. GONZALES: The only objection I have, Judge, would be whether or not that's

based on his personal knowledge, not on hearsay. If it's based on hearsay I'd object. If it's based on personal knowledge I wouldn't object.

THE COURT: Well, do you have personal knowledge of that?

THE WITNESS: Hearsay.

MR. CONVERTINO: I'm wondering if he heard that over a run as well, Judge.

THE COURT: Well, you may ask him.

BY MR. CONVERTINO:

Q. Did you hear over a radio call that Eric Williams was inside the Detroiter Bar?

A. No.

Q. Did you hear over a radio run that Eric Williams broke out two panes of glass at the Detroiter Bar?

A. No.

Q. Did you hear over a radio run that Eric Williams was inside the Detroiter Bar man-handling customers and acting very aggressively?

A. No.

Q. Did you hear over the radio-

MR. GONZALES: Eventually we could be here all evening. I think the extent of what he heard over the radio run has already been testified to thoroughly by this officer.

THE COURT: I think so too, Counsel.

BY MR. CONVERTINO:

Q. Did you know prior to arrival that Eric Williams threw a brick at a car?

MR. GONZALES: Same objection.

THE COURT: I'll sustain the objection. I think he testified to what he heard on the run.

MR. CONVERTINO: Thank you, Judge.

BY MR. CONVERTINO:

Q. Sir, you said in your deposition testimony that it was the common MO of Eric Williams to take his clothes off. Do you remember saying that in your sworn statement?

A. Yes.

Q. Do you know if based upon your--and you say that based upon your contacts you had with Eric Williams; is that right?

MR. GONZALES: Again, object to specific instance of prior contact this officer had; especially since there's apparently no evidence on this record that Trooper Morningstar, the defendant in this case, even knew the person.

THE COURT: Well, I'll allow him to

answer that particular question. He can answer it.

THE WITNESS: Could you repeat it, please.

BY MR. CONVERTINO:

Q. You said that it was common, I think you used the term MO, for Eric Williams to take his clothes off, right?

A. Correct.

Q. And that was based on your prior contact with him; is that right?

A. Correct.

Q. And your prior contact with him you can say what was common, as you did in your deposition testimony, common to the contact you had with Eric Williams; can you do that?

A. Yes.

Q. During the contact you had with Eric Williams was he ever violent with you?

A. No.

Q. During the contacts you had with Eric Williams did he ever approach you in a very quick uncertain manner?

MR. GONZALES: Judge, I'm going to object to the relevance of this. Obviously it's totally irrelevant. Trooper Morningstar had no

knowledge of this. This is not the defendant, Judge.

MR. CONVERTINO: Well, Judge, if I may respond?

THE COURT: Yes.

MR. CONVERTINO: Thank you, sir. The prosecution asked specifically on two separate occasions whether Officer Wheatley drew his service revolver. The prosecution asked if Officer Mix drew her service revolver. I'm asking why he didn't. I want to know why he didn't. He said it's based on prior contacts. I want to know what they were.

MR. GONZALES: Your Honor, it's a stretch to say that when I'm asking for the officer's activity when he turned on the headlights, when he turned on his overheads or when he got his gun out or not. It's a stretch to open the door to get into specific instances of improper conduct. It's totally irrelevant.

THE COURT: I'm going to sustain the objection. What you're going to do is--this is not the defendant. He's the witness.

MR. CONVERTINO: I understand, Judge, but there was a divergence in what this

officer did and to what this officer did. There's a clear reason and I wanted to get at that. Thank you, Judge.

BY MR. CONVERTINO:

Q. You didn't, during the time you were going to the call when you suspected it was Eric Williams, you didn't put out anything over your radio channel that it may be Eric Williams, did you?

A. No.

Q. You're aware, sir, that Michigan State Police routinely monitor Detroit Police Department's radio channels while they're in the city of Detroit; is that right, sir?

A. That's correct.

Q. You said, sir, that during the time you arrived at the intersection that there was no issue for crowd control. You said that in the deposition statement? Did you say that, sir?

MR. GONZALES: Your Honor, I'm going to object. Counsel keeps referring to what the officer said in his investigative subpoena testimony. First of all, it's not a deposition; secondly, it is hearsay nonetheless, and he's simply bringing out statements and asking him if that's what he said. That's calling for

hearsay.

MR. CONVERTINO: How is that hearsay, Judge, prior statements?

THE COURT: It is a prior recorded statement. I assume it was taken so that's the tricky-

MR. GONZALES: Judge, I think it would be more in the nature of using it for impeachment if there was something inconsistent. He's bringing out testimony he picks and chooses.

THE COURT: Well, because I don't have the option of knowing what he said, I don't know if it's consistent or inconsistent. Certainly we're not just going to go over that deposition. If it is not an inconsistent statement then I would sustain the objection.

MR. CONVERTINO: Thank you, Judge. I'll move on, Judge.

BY MR. CONVERTINO:

Q. Sir, after Eric Williams was shot he continued to move forward, didn't he?

A. Yeah. He went over forward, yes.

Q. After the shot occurred and he was placed on the vehicle Trooper Morningstar checked his pockets and

his hands for weapons; did you see that, sir?
A. He appeared to be patting him down. As far as exactly what he did I can't testify to it.
Q. Yes, sir, I understand. After that you saw Trooper Morningstar place Eric Williams on the pavement. Did you see that, sir?
A. Correct.
Q. And then directly after that you saw Trooper Morningstar go immediately for his first aide kit in the trunk of his cruiser; is that right, sir?
A. That's correct.
Q. And then Trooper Morningstar immediately began to give first aide to Eric Williams; is that true, sir?
A. True.
Q. I'm sorry?
A. That's correct.
Q. And he was assisted in some part by Officer Mix; is that right?
A. That's correct.
Q. Did you speak to Trooper Morningstar that night?
A. No.
Q. You don't recall going up to Trooper Morningstar at all that night?
A. No.
Q. Do you recall Trooper Morningstar as he was

administering CPR to Eric Williams telling Eric Williams-

MR. GONZALES: I'm going to object if it's telling Eric Williams. It's obviously quoting his client and that's hearsay.

THE COURT: I'll sustain.

MR. CONVERTINO: Judge, it goes directly to his intent.

MR. GONZALES: Still, Judge, it's still hearsay, and this officer can't testify to out-of-court statements for the truth. Now he's actually saying it's for the truth of the matter, so it's clearly hearsay.

MR. CONVERTINO: Excited utterance, Judge.

MR. GONZALES: Not on this record, Judge.

THE COURT: Well, he said it's excited utterance.

MR. GONZALES: Not on this record, Judge. I haven't heard any foundation for that. This is after the fact. We don't know what point in time. We don't know if this officer can say what was going through his mind.

THE COURT: Well, he did say it was

right after he was shot. I'll allow it.

BY MR. CONVERTINO:

Q. Right after he was shot Trooper Morningstar was administering CPR to Eric Williams. Do you recall him saying, "Don't die, don't die, please don't die"?

A. I do.

Q. You do recall that, sir?

A. Yes.

Q. It's possible, sir, that someone who didn't have a relationship with Eric Williams would perceive the events that occurred that night differently than the way you perceived them; isn't that true, sir?

MR. GONZALES: Speculation.

THE COURT: I'll sustain.

BY MR. CONVERTINO:

Q. You don't know, sir, that at the time Trooper Morningstar discharged his weapon, you don't know if it was an accident, do you?

A. No.

Q. You don't know if his finger twitched, do you?

A. No.

Q. When we look at the video, sir, is it fair to say that when Eric Williams' pants were down that didn't impede his progress toward the trooper; is that right, sir?

A. It didn't totally impede him, no.
Q. You told us, sir, on direct examination that when you pulled up there you were not focusing on Eric Williams' hands; do you remember telling the prosecutor that, sir?
A. I do.
Q. Your car as we see it positioned in the frame right here is facing directly toward the Michigan State Trooper vehicle; is that right, sir?
A. That's correct.
Q. Your headlights are facing toward Trooper Morningstar; is that right?
A. Correct.
Q. And they were--that night, is what I should say, why didn't you turn on the microphone?
A. Why didn't I?
Q. Yes.
A. I didn't find a need to.
Q. Well, the microphone would have told us whether or not Trooper Morningstar said, "Stop, stop, show me your hands", right?

MR. GONZALES: Your Honor-

THE COURT: Sustained.

MR. GONZALES: -speculation. Thank you.

BY MR. CONVERTINO:

Q. Sir, when you prepared your police report that night did you have any input from your supervisors?

A. Not at all.

Q. So the drafting of the report and words that were put in there were yours; is that right?

A. That's correct.

Q. And Officer Mix as well?

MR. GONZALES: Your Honor, speculation, if he knows. How does he know?

THE WITNESS: I don't know.

BY MR. CONVERTINO:

Q. Well, you reviewed it, didn't you?

A. Yes, I did.

Q. So the way that Trooper Morningstar was characterized in that report was based on your observation; is that what you're saying?

A. That's correct.

MR. CONVERTINO: Thank you, Judge.

THE COURT: Any redirect, sir?

MR. GONZALES: None, your Honor.

THE COURT: You may step down.

MR. DONALDSON: Dr. Pasquale. Your Honor, with the Court's indulgence, I'm going to be conducting this portion of the exam.

THE COURT: Ma'am, please raise your right hand. Do you solemnly swear or affirm that the testimony you will give will be the truth?

THE WITNESS: Yes.

THE COURT: Have a seat, Doctor, and keep your voice up.

MELISSA PASQUALE-STYLES,

having been first duly sworn, was called as a witness at 3:46 p.m., and testified as follows:

DIRECT EXAMINATION

BY MR. DONALDSON:

Q. Tell the Judge your name and your occupation, please.

A. Melissa Pasquale-Styles and I'm a forensic pathology fellow at the Wayne County Medical Examiner's Office here in Detroit.

Q. What sort of training have you had to assume the position you're in now?

A. I graduated from medical school from Wayne State University School of Medicine in the year 2000. I trained for three years in anatomic pathology in Miami, Florida. I trained for one year in forensic pathology in Miami, Florida, and I am right now two weeks away from finishing my last year of training in

forensic pathology here in Detroit, Michigan.
Q. And how long have you been working with the Wayne County Medical Examiner's Office?
A. One year.
Q. And during the course of that year have you had occasion to render an opinion in any court of law as to cause and manner of death?
A. Yes, I have.
Q. On one occasion or more than one occasion?
A. More than one occasion.
Q. Can you give us a guesstimate as to the number?
A. Twenty-three times prior to today.
Q. Some day you won't remember the exact number I bet.

MR. DONALDSON: I'll turn over the witness for voir dire relative to qualifications.

MR. CONVERTINO: May I, Judge?

THE COURT: Sure.

VOIR DIRE EXAMINATION

BY MR. CONVERTINO:
Q. Are you board certified, ma'am?
A. Yes.
Q. Can you tell us what board are you certified with?
A. I am board certified in anatomic pathology.

Q. What does that mean exactly; anatomic pathology?
A. Anatomic pathology is the study of disease process in the body.
Q. Does it have--do you have any specialty in forensic pathology?
A. Yes. I have trained for two years in forensic pathology.
Q. Under whom?
A. I trained under the direction of Dr. Bruse Hyma, the chief medical examiner in Miami Day County, Florida and under the direction of Dr. Carl Schmidt, who is the Chief Medical Examiner here in Detroit.
MR. CONVERTINO: Thank you, Judge. Thank you, ma'am.
MR. DONALDSON: I'd ask that she be qualified as an expert.
MR. CONVERTINO: No objection.
THE COURT: I shall so find.
BY MR. DONALDSON:
Q. Were you working in that capacity on the 14th day of April of this past year?
A. Yes.
Q. Were you presented with the body of an individual who was identified to you as Eric Williams?
A. Yes.

Q. And how do you go about your job as a forensic pathologist; how did you form your analysis in this particular case?
A. I first did an external examination on the body documenting and identifying characteristics as well as external injuries. I then proceeded to do an internal examination in which the body was opened and all of the organs were removed and examined for the presence of disease and or injury. And also the brain was removed and examined for any possible disease or injury.
Q. And, after you completed that process, did you form an opinion, first of all, as to the cause of Mr. Williams' death?
A. Yes.
Q. What was the cause of his death?
A. A single gunshot wound of the chest.
Q. And did you reach a conclusion as to the manner of death?
A. Yes.
Q. And what was the manner of death?
A. Homicide.
Q. When you began your examination by doing an external examination do you take gross measurements in terms of height and weight?

A. Yes.
Q. How tall was he and how much did he weigh?
A. He was 5'9 inches tall and he weighed 164 pounds.
MR. DONALDSON: And, your Honor, with the Court's indulgence, I'd ask the Doctor to utilize myself to demonstrate in terms of certain injuries she observed during any external examination.
BY MR. DONALDSON:
Q. Step down, please, Doctor. Could you indicate to the Court what, if anything, of significance you noted during the course of the external examination of Mr. Williams?
A. He had a gunshot entrance wound on the left side of his chest just above and inside the nipple here.
Q. Were there any other injuries of significance during the course of your external examination?
A. Yes. He had two small lacerations on his second and third fingers; very small lacerations. He also had a very small abrasion on his wrist.
Q. I believe you indicated the fingers with the right hand and the abrasion was the left; is that correct?
A. Yes.
Q. Were those fresh injuries?
A. Yes.

Q. Were there other injuries on or about his person that were not related to the period surrounding his death?
A. He did have an old healing abrasion on the leg, and if I recall correctly, one on the ankle. I would have to refresh my memory, but they had nothing to do with the death.
Q. You can resume your seat. Did you proceed to do an internal examination? You already testified you did. What were the results of that?
A. I found that the gunshot wound track went through the heart and through the left lung and the wound track ended in the left back where I retrieved a bullet.
Q. Is there a concept in the field of forensic pathology known as evidence of close-range firing?
A. Yes.
Q. Can you describe to the Court what that is?
A. When a bullet leaves the end of the barrel of a gun, not only do the bullets leave the gun but also soot and smoke. That smoke is comprised of un-burned gun particles as well as burned particles such as soot. If the end of the gun is approximately two feet or less away from the target I will see evidence of the close-range firing on the skin surrounding the wound, meaning I will see either soot or gun powder

stippling on the skin surrounding the wound.
Q. Was there any evidence of close-range firing on or about the person of Eric Williams?
A. No.
Q. Would the presence or absence of clothing make a difference in whether or not you make that observation?
A. Yes.
Q. When he came to you he was not clothed?
A. No.
Q. So any evidence of close-range firing in theory could have been left on that item?
A. Yes.
Q. Now, as part and parcel of your procedures, do you take samples of various fluids from the deceased?
A. Yes.
Q. Was that done in this case?
A. Yes.
Q. What sort of fluids were taken and why?
A. In an autopsy we take blood. We take eye fluid. We take bile and urine if it's present. In this particular case I took blood and bile and urine and vitreous fluid, which is eye fluid.
Q. Why did you do that?
A. Those are taken and submitted to the Toxicology

Department within our building.

Q. Did you have the results of the toxicology analysis at the time that you first rendered your opinion as to cause of death?

A. No.

Q. Did you think it was necessary to have those reports before you rendered your opinion?

A. No.

Q. Why was that?

A. The victim clearly died of a gunshot wound of the chest. Most of our cases we do not need the results of a toxicology analysis in order to determine the cause of death. We only wait for the tox if we think that the toxicology significantly contributed to the cause of the death.

Q. What sort of things are tested for?

A. The toxicology tests test for alcohol as well as street drugs such as cocaine or heroine and also most prescription medication.

Q. And have you received those results since you first rendered your opinion as to what killed Mr. Williams?

A. Yes, I have.

Q. And was he positive for or negative for any of the items that you described?

A. Yes, he was positive.
Q. For what, if any, items?
A. He was positive for alcohol in his blood as well as a breakdown product of cocaine called Benoylecgonine, B-E-N-O-Y-L-E-C-G-O-N-I-N-E.
Q. What was the level of his blood alcohol and the various fluids that you looked at?
A. He had a blood alcohol of .24 micrograms per milliliter. He had a urine alcohol of 0.23 and a vitreous alcohol or eye fluid alcohol of 0.21.
Q. Now, when you use those numbers, .21 and .23 and so on, is that similar to what we hear when people are arrested for drunk driving and their blood alcohol level is reported?
A. Yes.
Q. Is there any significance in the fact that you achieved three different levels; .24, .23 and .21?
A. Yes.
Q. What's that significance?
A. The blood alcohol level is slightly higher than the urine and the eye fluid alcohol levels. That tells me that the victim was still in the absorptive phase of his alcohol levels. In other words, he was still actively absorbing alcohol in his system and that means most likely that he had been drinking alcohol

within the last hour.
Q. All right. Now, did Mr. Williams test positive for the presence of cocaine?
A. Not cocaine itself, no.
Q. Was that tested for?
A. Yes.
Q. In all three of those locations?
A. No. It was tested for in the blood.
Q. And was the--strike that. The thing that tested positive, can you say that again for me again?
A. Benoylecgonine. It's more commonly just referred to as BE.
Q. The presence of BE, can you tell anything from that result in combination of with other results, particularly the absence of cocaine, as to whether or not Mr. Williams was under the influence of cocaine at the time of his death?
A. He was not under the influence of cocaine at the time of his death.
Q. Why do you say that?
A. I say that because the presence of BE tells me that he used cocaine most likely within the last one to two days. With this very large amount of alcohol, if he had cocaine in his system at the time that he died, first of all, we should see it on the tox

results, and we do not see cocaine on the toxicology results. Also, with this large amount of alcohol, if there was any cocaine present at the time that he died, I would expect to see another compound called Cocaethylene, C-O-C-A-E-T-H-Y-L-E-N-E.

Cocaethylene is a compound that is formed in the liver. The liver makes Cocaethylene out of cocaine in the presence of large amounts of alcohol, and I would have expected to see Cocaethylene if there were any cocaine in the system at the time that he died.

Q. There was none?

A. There was no Cocaethylene.

Q. And that's why you testified previously that in your opinion he wasn't under the influence of cocaine at the time?

A. The combination of there's no cocaine on the tox as well as there's no Cocaethylene on the tox with this large amount of alcohol. Those two things together tells me that he was not under the influence of cocaine at the time that he died.

Q. And did either of those things have any impact on your decision as to cause of death, the presence of?

A. No.

MR. CONVERTINO: May I proceed?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. CONVERTINO:

Q. Good afternoon, ma'am.

A. Good afternoon.

Q. Did you actually do this exam?

A. Yes.

Q. And you prepared the report as well?

A. Yes, I did.

Q. Did you sign the report?

A. Yes, I did.

Q. So is there--do you have a signed report in front of you?

A. Yes, I do.

MR. CONVERTINO: Judge, for the record, the report I was provided is not signed by the witness. I'm uncertain as to whether she's testifying to a different report in sum and substance than the report I have and I'd like to review that.

MR. DONALDSON: No objection.

THE COURT: Do you have a copy?

MR. DONALDSON: Ours is unsigned.

THE COURT: Doctor, show him your report.

THE WITNESS: Yes.

MR. CONVERTINO: Can I come up there? May I, Judge?

THE COURT: Yes.

MR. CONVERTINO: Judge, may I have a moment to compare these two?

THE COURT: All right. Let's take a five-minute break.

MR. CONVERTINO: Thank you, Judge.

(The Court took a five-minute recess.)

THE COURT: Doctor, please come back to the stand.

MR. CONVERTINO: Judge, thank you for your patience.

THE COURT: You may continue.

BY MR. CONVERTINO:

Q. Sorry about that, Doctor. The report that you have is different from the report that I have in the signature that's missing from the report that I have. Can you explain why you signed that report?

A. When we generate a report, it is a created report and it is transferred to the secretary to print out. It is then reviewed and signed. In this particular case, it required three signatures. It required my signature, the signature of Dr. Pietak, P-I-E-T-A-K,

who was the attending forensic pathologist in the morgue that day, and it also required the signature of Dr. Carl Schmidt who is the chief medical examiner.

Now, the day that I prepared this report, which was the same day that I did the autopsy, we already had a request from the Prosecutor's Office for a copy of that report as soon as it was generated. And it just happened to be that a copy was faxed over before it had the third and final signature, which was my signature.

Q. Well, the report, the copy of the report that I have, just has Dr. Pietak's signature, not Dr. Schmidt's. Was Dr. Schmidt there as well that night?

A. Dr. Schmidt was there in that case. I didn't realize that your copy also didn't have his signature. It just means that a copy got faxed over before it got the last two final signatures, and then the original report was sent on to myself to review and to Dr. Schmidt to review and he signed it and the original signed report with three signatures goes in the file.

Q. Do you know why the prosecutor asked for the report to be faxed over that night?

MR. GONZALES: Judge, I object to relevancy. Actually, I'm not going to do that.

My partner is going to do that.

MR. DONALDSON: I'll stand by my partner's word.

THE COURT: If it's informational I'll allow it if she knows.

THE WITNESS: I don't know.

BY MR. CONVERTINO:

Q. Also in the last page of the report I have, which is the toxicology report, do you mind referring to that? The date line on the signature is April 29, 2005. Is that the same as the date on your signature line?

A. No. There was a second toxicology report that was reissued on May 16th. I do have a copy of the original toxicology report that is dated April 29, 2005 and that was voided and a new report was issued on May 16th 2005.

MR. CONVERTINO: Judge, I don't have the new report. I'd like to see that, if I may.

THE COURT: Yes.

BY MR. CONVERTINO:

Q. May I see that?

A. Yes.

Q. Are you able to compare those two reports?

A. Yes.

Q. Can you tell us how they compare?
A. The difference between the two reports is that after April 29th 2005 when the initial report was issued and signed, a sample of blood was sent under chain of custody to a location which is kind of code named here but it was sent for DNA testing, and so a new report was issued with that notation at the bottom and then signed again.
Q. May I see that, please?
A. Yes.
Q. Other than the portion on the bottom of that page and the date, are those two toxicology reports indentical?
A. Yes.
Q. Can you tell us why the blood work was sent for DNA testing?
A. That I do not know.
Q. Do you know why you requested that the blood work be sent for DNA testing?

MR. FENNESSEY: If it would make life easier we will stipulate that we requested the police department to do certain DNA testing on blood found at the scene and the deceased.

THE WITNESS: If I can just take a moment to read it.

MR. CONVERTINO: Thank you.

THE WITNESS: It appears to be, from paperwork in the file, that a law firm requested these samples to be sent for DNA testing.

BY MR. CONVERTINO:

Q. A law firm did?

A. Yes.

Q. Not the prosecutor?

A. From this letter it is a law firm that is not the prosecutor.

Q. There's a letter requesting that?

A. Yes.

Q. May I see that letter, please?

A. Yes.

MR. CONVERTINO: Judge, can co counsel review this?

THE COURT: Sure.

BY MR. CONVERTINO:

Q. Are there any other letters from any other law firms or requests in there for anything unusual?

MR. DONALDSON: Your Honor, I think we're going a little far field for preliminary examination. He can bring whatever discovery motions and things that are appropriate in the appropriate form. We're here

to determine whether or not there's probable cause to believe the crime occurred and whether or not the defendant committed it. This is discovery.

THE COURT: Well, I think it's obvious there are some differences in these autopsy reports. We might as well try to clear them up as best we can.

MR. CONVERTINO: Thank you, Judge.

THE WITNESS: There's another letter in the file requesting a complete copy of the autopsy report including lab reports, photographs and correspondence for the victim from the same law firm as listed.

BY MR. CONVERTINO:

Q. Can you tell us the date in the letter?

A. The date on this letter is May 4, 2005.

Q. I wanted to ask you--are you through looking?

A. Yes.

Q. I want to ask you a couple questions about first the toxicology report, if I may?

A. Yes.

Q. You testified about the presence of cocaine in the system of Eric Williams. Do you remember that testimony?

A. I testified that there was no cocaine.
Q. There was no cocaine?
A. There was no cocaine.
Q. Benoylecgonine, you referred to it also as BE, its a metabolite; isn't that correct?
A. Yes.
Q. It's a metabolite that specifically tells that someone had ingested cocaine; isn't that true?
A. Yes.
Q. And someone who ingested cocaine tests positive for that substance that's metabolite half life of?
A. Half life of Benoylecgonine is on the order of few hours.
Q. Few hours?
A. Yes.
Q. After that was present; isn't that true?
A. Yes.
Q. And the GCMS cocaine group that was run, that test was positive for cocaine; is that right?
A. No. That test was positive for cocaine and or its metabolite.
Q. And or its metabolite. It tested positive, right?
A. Yes.
Q. So when you testified that Eric Williams was not under the effects of cocaine on April 18, 2005; you

can't say that for certain, can you?
A. No, I can say that for certain.
Q. You can say for certain based upon the presence of BE in his system?
A. I can say that for certain based on the lack of cocaine in his system as well as the lack of Cocaethylene and the presence of the very high level of alcohol in his system.
Q. Isn't it true, though, that alcohol in cocaine enhances the effects of both?
A. When alcohol and cocaine are present together, yes, it is said that Cocaethylene enhances the effects of cocaine.
Q. And that can make someone aggressive and violent; the two substances in the system at the same time; is that right?
MR. DONALDSON: I'm going to object because there was no cocaethylene in the system. Now he's asking what if there had been. That's speculation.
THE COURT: I'll allow it.
BY MR. CONVERTINO:
Q. It can cause someone to act in a more violent manner than they would normally, right?
A. Possibly so if cocaine and alcohol are acting

together.
Q. The amount of alcohol that Eric Williams had in his system was a substantial amount; isn't that true?
A. Yes, that true.
Q. For reference purposes, .08 is when one is presumed to be intoxicated in the State of Michigan; is that right?
A. That's true.
Q. And this was point .23?
A. .24 in the blood.
Q. .24, I'm sorry. I wanted to ask you about close-range firing and the results of that on the skin. Possible results. You said that that would not be on the skin if the person were clothed or may not be on the skin if the person were clothed; is that right?
A. Yes, that true.
Q. For purposes of the definition you gave today of close-range firing, is that true, two feet from within?
A. In general it's within two feet of the end of the barrel.
Q. And let me ask you about the gunshot wound to the chest itself. When you're testifying here, you're the person who did all the tests on the body at the time the autopsy was conducted; is that true?

A. I completed the autopsy, yes.
Q. What does that mean; completed the autopsy?
A. With an assistant. I did the complete internal examination myself and an assistant assists with eviscerating the body or taking the organs out and I complete the entire dissection and preparing the reports.
Q. The person who's best suited to answer the questions about the condition of the body is you?
A. Yes.
Q. Okay. Thank you. The bullet entered as you pointed out on the prosecutor, the left forth rib the left side of the body you said about three inches or so above the left nipple; is that accurate? Interior medial forth rib?
A. Yes. The bullets went through the left chest and in through the left anterior forth rib.
Q. Okay. And then passed through the ventricle of the heart?
A. Yes.
Q. The left upper and left lower lung lobes, right?
A. Yes.
Q. And the left posterior lateral tenth rib?
A. Yes.
Q. And the soft tissue in the left of the back; is that

accurate?
A. Yes.
Q. And, if you're counting ribs for the uninitiated, the first rib is highest up on the body right here right about under the collar bone?
A. Yes.
Q. And it's decent one, two, three, four, five, six, seven, eight, nine, ten?
A. Yes.
Q. How many ribs do we have?
A. Twelve.
Q. Thank you very much.

MR. DONALDSON: Thank you, sir.

MR. CONVERTINO: I have no redirect, your Honor.

THE COURT: You may step down. Thank you, ma'am.

MR. GONZALES: Your Honor, there are no other witnesses on behalf of the People. I have a motion depending on whether or not Counsel has any witness.

MR. CONVERTINO: No. We have no witnesses today. Thank you, Judge.

THE COURT: You may proceed.

MR. GONZALES: With that, the People

move to bind the defendant over on the charges contained in the Complaint and Warrant. I ask the Court to bind the defendant over on count one, second degree murder and also alternative to count two, manslaughter death by weapon aimed with intent but without malice. I'd argue after Counsel.

MR. CONVERTINO: Thank you, Judge. Judge, we would ask that the Court not bind over, quash the count one of the indictment, that is, the second degree murder since not one scintilla of evidence shows any malice whatever on the part of Trooper Jay Morningstar. The testimony was that the incident occurred, the death occurred, that the discharge of the weapon occurred. Judge, one can infer based upon the evidence adduced here today that it may be a whole host of other things that caused the discharge of the weapon and none of them are malice. It could have been an accident, Judge.

Judge, you have a duty not to bind it over on the second degree murder. If it was a mistake, if it was a negligence, if it was recklessness, anything but malice, Judge, you'd

have a duty not to bind it over on the second degree murder, but may bind it over on one of the lesser included involuntary manslaughter.

We would ask, Judge, that you consider all of the evidence. You must take the evidence in light of the fact that no one testified in any way, shape or form that this killing was purposeful, was intentionally done, was unjustified and was not acting without fully--without malice, Judge. Judge, the witness, Officer Wheatley said that the situation was rapidly evolving, that the situation was tense and uncertain. That's the very test, Judge Baltimore, that the Supreme Court used in Graham v. Conner to support the contention of what indeed is justifiable use of force.

You saw from the video that Eric Williams progessed toward Trooper Morningstar. There's nothing to indicate, Judge Baltimore, that Trooper Morningstar did not say repeatedly stop but instead that Officer Wheatley sat in the car at the time he pulled up with the windows up; with the windows up, Judge. The discharge of the weapon could have been

accidental. Officer Wheatley said that.

The discharge of the weapon could have been negligence. It could have been a whole host of other things. There is no one, Judge, who testified today about the presence of malice in the mind of Trooper Morningstar at the time indeed. Officer Wheatley said himself that in the position of Jay Morningstar, Jay Morningstar may have entered those events totally differently than the interpretation of Officer Wheatley because Officer Wheatley had a prior history with Eric Williams.

Officer Wheatley arrested him or was involved when he was arrested. He knew this man. Trooper Morningstar didn't. Judge, this whole series of events from start to finish took place in no more than eight seconds, Judge; eight seconds from the time Trooper Morningstar pulled up to that intersection to the time that Eric Williams was upon him was no more than eight seconds, Judge.

It was tense, rapidly evolving in an uncertain situation and that falls within the Graham versus Conner. In addition, Judge, if you're considering this issue, which I hope you

are, we would like to present, if you're not prepared to make the decision today, we would like to present a brief on the matter as to why this should not be bound over on second degree murder but ask that if you bind it over on anything it should be voluntary or involuntary manslaughter. And we would ask that a lesser offence of reckless discharge of a firearm be included in your bind over decision.

Judge MCL.5--pardon me. MCL 752.861; we would ask that the Court consider this. We would ask that in the absence of malice the Court--People v. King is required not to bind it over on murder charges, and we would ask that you take this courageous stance based upon the evidence presented today. Thank you, Judge.

MR. GONZALES: Thank you, your Honor. Your Honor, I would ask the Court to in fact bind the defendant over on second degree murder. I think the record is clear that malice is plain from the testimony both of the officer and the video. Malice is not something that Counsel seems to characterized as anything that would show like an bad or evil intent. That's

not what malice is legally.

Secondly, Convertino asked this Court to find evidence on this record that the defendant either had one of three states of mind; that he intended to kill Mr. Williams or that when he fired he intended to do great bodily harm to him or that he created a very high risk of death or great bodily harm knowing that such harm would be the likely result of his actions. That's the legal difference of malice; not the one they described of possibilities of intention going through Mr. Morningstar's mind.

Regardless of all that, it's nothing more than a question of fact. That is what a trial is for. That is what a jury or judge is for to decide on whether or not there is a question of fact as to whether or not there is enough evidence on this record. Rather the contrary is there is enough evidence. We have the officer's testimony that he observed--and I respectfully disagree with Counsel, I didn't hear him say this was a tense situation; that this was something that he felt was tense. It was the opposite; he said no. That's evidence to the contrary. That's evidence to show that

the defendant, when he did the act, had no justification or excuse that when he fired--the evidence is clear from the medical examiner it's a shot to the heart.

It's a shot that penetrated the heart and goes through the ventricle and that's not a close range. The officer is outside of three feet. There's no evidence on this record that there was anything that was said. There is no evidence on the record that it was close range from the medical examiner. The officer says it happened within about thirty to forty seconds. The video says even less.

Basically the video shows unequivocally that Mr. Morningstar got out of his vehicle, walked around the open car door. As he's doing so he pulls his weapon, aims and shoots at an individual that does nothing more than walk towards him. That is clear intent to either kill or do great bodily harm or knowingly create a high risk of death. When that evidence is clear on the video tape this Court, I submit, has enough evidence to bind over on second degree murder and the remaining arguments that Counsel raised with respect to accident or

intent are nothing more than a question of fact.

Nothing on this record says anything about an accident. Nothing on this record says that there was a problem with the trigger. Those are questions of facts for a jury, Judge. And the argument that counsel raised when he cites the civil case I think is inappropriate for this Court to accept and rely upon. Rather, what should be considered, your Honor, is the fact that on this record we have a clear videotape of an individual in a very short period of time who makes a direct action of coming out of his vehicle, stepping around the car, pulling his weapon, shooting an individual who does nothing more than walk upon him. That's, in my opinion, Judge, overkill and I would ask your Honor to bind the defendant over. Thank you.

MR. CONVERTINO: Judge, may I respond?

THE COURT: All right.

MR. CONVERTINO: I just think it's important, Judge, People v. George said one of the purposes of preliminary exam is to weed out the groundless and unsupported charges and to

relieve the accused of the degradation and expense of a criminal trial. It's not as the prosecutor wants; a scintilla of evidence goes to the jury. That's not the standard, Judge. People v. King sets that forth. The standard is whether or not there is malice.

By Trooper Morningstar getting out of his vehicle with a man rapidly approaching him with his hands not clear, as Officer Wheatley testified, he doesn't--if Officer Wheatley doesn't know where his hands are when we're playing it frame by frame in slow motion and rewinding it and playing it again, how is Trooper Morningstar going to know where his hands are when this man is approaching without any ability to discern what this person wants and what he is going to do?

You have--he doesn't stop. He comes forward. There is nothing, nothing on the record, Judge, that will allow you to find malice because he got out of his police car. That's his duty as a Michigan State Trooper. Because he confronted somebody coming toward him, that's his duty as a Michigan State Trooper because he leveled his weapon. That's his duty

to do, Judge. You cannot punish a man for doing what the People in the State of Michigan hired him, trained him to do. He did not commit second degree murder; he did not. And there is no malice on this record that would allow that to be bound over on that count.

THE COURT: All right.

MR. CONVERTINO: Thank you.

THE COURT: Well, you both know that it is not--I am not here to particularly try this case and thus I am not here to guess at what may have been going on in the mind of the defendant. The simple question before me is whether or not the prosecution have made a prima facie case to send this man over to a fact finder. Yeah, I am persuaded that based upon what was shown that there is sufficient basis for me to bind him over for the following reasons. Testimony--I can't guess at whether or not Trooper Morningstar's gun was when he pulled it that it was an accident that he shot him.

The only thing I can do is look at what the facts show is that here an individual was--a death occurred caused by the defendant. Malice and aforethought may be determined by a

fact finder based upon the circumstances surrounding this incident. Particularly, the fact that you have--that there is nothing to suggest that this victim was threatened by the officer, particularly when the officer was in the automobile, if there--I know you said that the people higher him to confront the individual, yes, but the people doesn't higher him to shoot those individuals. That's what the record clearly indicates.

Yeah, he may have been obligated to confront this individual; but to shoot him? Now, whether it was an accident, I don't know, but that is what the purpose of the fact finder or a jury is charged to do. As far as--I'm concerned in this particular matter, the prosecutor has established sufficient evidence to show that the death occurred, it was caused by this particular defendant and that there was simply no justification on this record for me to conclude otherwise; and therefore, I shall bind him over on both counts. The Arraignment on the Information is going to be June 28th.

MR. GONZALES: Thank you, your Honor.

MR. CONVERTINO: There's another matter I'd like to address, if I may.

THE COURT: You may.

MR. CONVERTINO: I'd like to address bond at this point.

MR. GONZALES: Sorry to interrupt, but now that the defendant has been bound over, your Honor, your Honor has no jurisdiction on this matter. It's a matter for Circuit Court. I have no objection to referring the defendant to a bond for hearing motion.

THE COURT: What is the bond? Is he on bond now?

MR. GONZALES: Yes.

MS. FERBER: Two hundred thousand dollars ten percent.

THE COURT: So what is it?

MR. CONVERTINO: I want to know if the Court will consider reduction in bond.

THE COURT: Not under these circumstances. I will make a referral to the Defendant Screening Unit where they can do a determination.

MR. CONVERTINO: Thank you.

MR. GONZALES: Thank you, Judge.

THE COURT: Bond is continued.

(The proceedings concluded at 4:40 p.m.)

--- --- ---

C E R T I F I C A T E

STATE OF MICHIGAN)

)

COUNTY OF WAYNE )

I, **Sherrayna White Moore,** Official Court Reporter of the 36th District Court for the City of Detroit, State of Michigan, do hereby certify that the foregoing pages 1-120, inclusive, is comprised of a full, true and correct transcript of the proceedings and testimony taken in the matter of the People of the State of Michigan versus Jay Morningstar, District Court #05-59773 at a Preliminary Examination on Tuesday, June 21, 2005, before the Honorable Joseph N. Baltimore.

6/29/05
DATE

Sherrayna White Moore
Sherrayna White Moore
421 Madison, Suite 4066
Detroit, Michigan 48226

Mechanically reproduced copies of this transcript are not certified unless the certificate page bears an original signature.